[No. S005882. Sept. 6, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER HEDGECOCK, Defendant and Appellant.

In re ROGER HEDGECOCK on Habeas Corpus.

COUNSEL

Cleary & Sevilla and Charles M. Sevilla for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Frederick R. Millar, Jr., and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KENNARD, J.—Defendant Roger Hedgecock, formerly Mayor of the City of San Diego, was convicted by a jury of one count of conspiracy to violate state and local financial disclosure laws and twelve counts of perjury based on errors or omissions by him in disclosure statements required by the Political Reform Act of 1974 (Gov. Code, § 81000 et seq. [the Act]). We granted review to address two questions.

First, in a perjury prosecution based on errors or omissions in disclosure statements required by the Act, is the materiality of the errors or omissions an element of the offense to be determined by the jury? We conclude that it is, and that in this case the trial court's failure to submit the materiality issue to the jury requires reversal of defendant's perjury convictions but not his conspiracy conviction.

Second, does a trial court have discretion to grant an evidentiary hearing on a new trial motion based on jury tampering or jury misconduct, and to have jurors called to testify at the hearing? We hold that, consistent with the practice predominating in the federal and state courts, a trial judge has such discretion. Because of the trial court's erroneous belief in this case that it lacked authority to grant defendant's request for an evidentiary hearing, the matter is remanded so the trial court can determine whether there should be such a hearing.

FACTS

The Act requires all public officials to file annual statements of economic interests (SEI's) disclosing their investments, interests in real property, and

income. (See Gov. Code, §§ 87200, 87203, 87206, 87207.) In addition, elected officials, candidates, and campaign committees must file periodic campaign disclosure statements (CDS's) regarding contributions and expenditures. (See Gov. Code, §§ 84200, 84211.) In compliance with the Act, defendant—first as a member of the San Diego County Board of Supervisors and later as a successful candidate for Mayor of San Diego— filed a number of SEI's and CDS's during the years 1980 to 1984. Defendant verified each SEI and CDS under penalty of perjury, as required by Government Code section 81004.

The prosecution contended that defendant failed to disclose his receipt of substantial contributions in an effort to circumvent local ordinances (San Diego Mun. Elec. Control Ord., §§ 27.2941, 27.2942) that limited individual campaign contributions to $250 per person and prohibited contributions by businesses. Most of the undisclosed contributions came from Nancy Hoover, an old friend of defendant, and Jerry Dominelli, a stockbroker involved with Hoover. Hoover and Dominelli owned J. David and Company (ostensibly a foreign currency trading firm), and some of the contributions were made in the company's name.

The prosecution claimed that Hoover and Dominelli made unreported contributions as follows: (1) financial support for Tom Shepard and Associates, which provided consultation services for defendant's mayoral campaign; (2) a donation of $3,000 used to create a computer list of names for fundraising purposes; (3) Hoover's "purchase" of a promissory note owed to defendant, who continued to receive interest payments on the note after the purchase; and (4) financial assistance for the remodeling of defendant's home. In addition, the prosecution contended that Harvey Schuster, one of defendant's supporters, had paid $500 for legal services performed solely for defendant's benefit. A discussion of these five incidents follows.

A. *Tom Shepard and Associates*

In late 1981, when defendant (then a member of the San Diego County Board of Supervisors) began his campaign for Mayor of San Diego, his administrative assistant, Tom Shepard, left to start Tom Shepard and Associates (TS&A), a political consulting firm. Nancy Hoover agreed to be a limited partner and the sole source of funding for the firm, with a capital contribution of $120,000. In January 1982, TS&A commenced operations in an office leased by J. David and Company. In the first six months of 1982, TS&A performed a substantial amount of campaign work for defendant, even though it had not been retained to do so.

In the summer of 1982, the "Roger Hedgecock for Mayor Committee" was formed. The committee agreed to pay TS&A a retainer of $750 per

month for consultation services until defendant's formal announcement of his candidacy for mayor. In November 1982, when defendant officially declared his candidacy, the contract was modified to provide TS&A with a 15 percent commission on all media advertising placed during the campaign plus reimbursement of all direct costs. This agreement remained in effect through the mayoral election in May 1983. According to prosecution experts, the agreement differed from the standard industry contract in that it included no commission on services other than media advertising, and the terms of the contract made it inevitable that TS&A would sustain a loss on the campaign.

Before defendant's official declaration of his candidacy for mayor in November 1982, Hoover made capital contributions to TS&A at the rate of about $10,000 per month. Hoover and Dominelli wrote checks in excess of $352,000 to TS&A between January 1982 and December 1983.

During 1982 and the first half of 1983, TS&A suffered a substantial loss on defendant's account. A prosecution expert testified that from August 1982 (the month TS&A was first retained by the Roger Hedgecock for Mayor Committee) to May 1983 (the month of the mayoral election) TS&A's loss on defendant's account was between $137,887 and $157,386, while its profit on other clients was between $19,958 and $39,457. In this period, defendant's account comprised nearly 85 percent of TS&A's revenues.

Defendant failed to report on any of his CDS's the financial support that Hoover and Dominelli provided to TS&A, the losses TS&A sustained while running defendant's campaign, or the uncompensated campaign work performed by TS&A.

B. *Donation for Computer List*

In the spring of 1981, defendant and fellow supervisor Jim Bates agreed to merge their lists of campaign supporters to create a master computer file and to split the cost of preparing the file, which was not to be sold without the other's approval. Defendant paid the $2,700 bill with the proceeds of a $3,000 check he received from Dominelli on December 21, 1981. Defendant later told an aide he had sold the computer list to Tom Shepard for $3,000. Defendant's 1981 CDS showed a $3,000 "loan" from defendant to his campaign committee, but neither the 1981 CDS nor the 1981 SEI disclosed defendant's receipt of the $3,000 check.

C. *Legal Consultation*

In late 1981, defendant experienced serious personal financial difficulties. Because he was concerned about adverse effects on his political future if

there were foreclosures on his real estate investments, he sought the advice of Harvey Schuster, one of his supporters. Schuster arranged a meeting between defendant and a real estate attorney in Los Angeles. Schuster paid for the trip and $500 in attorney fees. Defendant failed to disclose these payments on his 1981 SEI.

D. *The Promissory Note*

In March 1982, defendant and his wife began collecting monthly payments on a $22,500 promissory note secured by a third deed of trust on residential property. Later that year, defendant talked to Hoover about selling her the trust deed for $16,000. In November 1982, Hoover told her lawyer to prepare the necessary legal documents for the transfer but not to record the assignment of the deed until June 1983, so that defendant could realize a tax benefit. On December 17, 1982, Hoover paid defendant $16,000 for the trust deed. Defendant immediately invested $10,000 in a J. David and Company account. No one informed the property owners of the sale of the trust deed, so they continued making their interest payments to defendant.

In December 1982, the property owners offered to pay off the note, suggesting that it be discounted to $16,000. Defendant, however, insisted on full payment. He and Hoover then told Hoover's attorney they were modifying their agreement regarding the note to provide that, if defendant could get full value on the note, Hoover would return the note to defendant in exchange for $16,000 plus interest. The property later was sold, and the new buyers assumed the loan from defendant.

Defendant failed to disclose on his 1982 SEI the $16,000 he had received from Hoover, apparently on the theory that the transaction was not to be completed until 1983. He also failed to report on the appropriate SEI's his $10,000 investment in the J. David and Company account and the interest payments that he continued to receive on the note after Hoover's "purchase" of it.

E. *Renovation of Defendant's Home*

In the spring of 1983, Hoover agreed to lend defendant money to remodel his home. When Hoover told her attorney about the loan, he recommended that the transaction be documented. Hoover responded that defendant was going to turn over his original $10,000 J. David and Company investment (by then worth more than $48,000), which she expected to increase in size. She ignored her attorney's requests for documentation.

In July 1983, Columna Contractors, Inc. (Columna), in which Hoover had a 90 percent ownership interest, began the renovation project on defendant's home. Defendant's wife paid Columna's first two biweekly bills, but Dominelli and Hoover paid the remaining bills.

In February 1984, J. David and Company started to collapse after disclosures that Dominelli was operating a complex scheme to defraud investors. Columna ceased work on defendant's home, and subcontractors threatened to file mechanics' liens. Only then did defendant have documents prepared stating that Hoover had lent him $130,000 to do the remodeling. Because a wealthy supporter agreed to buy certain property that defendant owned and to guarantee defendant an $80,000 loan in lieu of putting the purchase price in escrow, defendant was able to avoid the mechanics' liens.

Although defendant's 1983 SEI mentioned the $130,000 loan from Hoover, it did not show Dominelli and J. David and Company as additional sources for the loan.

Based on these incidents, the prosecution charged defendant with one count of conspiracy (Pen. Code, § 182), fourteen counts of perjury (Pen. Code, § 118) and one count of conflict of interest (Gov. Code, §§ 87100, 87103, 91000, subd. (a)). Each perjury count was based on the filing of a separate SEI or CDS that allegedly failed to disclose information required by the Act. Some of the counts encompassed the failure to disclose several different types of contributions.

The jury convicted defendant of one count of conspiracy and twelve counts of perjury. It acquitted him of two counts of perjury and the count charging him with conflict of interest. After denying defendant's motion for a new trial, the trial court placed defendant on probation for three years subject to various conditions, including one year in county jail.

DISCUSSION

A. *Materiality as an Element of Perjury*

Defendant contends that the trial court's instructions erroneously withdrew from the jury's consideration the question of whether defendant's misstatements and omissions were material. We first determine the meaning of the term "material" in the context of a perjury prosecution based on the filing of declarations required by the Act. We then explain that materiality is an element of the offense to be determined by the jury, and that our ruling applies to defendant. Finally we conclude that the trial court's instruction

to the jury that defendant's statements were material requires, as a matter of law, reversal of his convictions for perjury.

The trial court gave the jury a modified version of CALJIC No. 7.21 (1982 rev.) (4th ed. pocket pt.), which sets forth the elements of the offense of perjury when it is based on a false declaration under penalty of perjury.[1] The court's instruction, consistent with the language of CALJIC No. 7.21, treated materiality as a matter not within the province of the jury. In relevant part, the instruction stated: "If you find that the defendant made one or more of the statements as charged, such statements were *material* matter within the definition of perjury read to you." (Italics added.)

Relying on our decision in *People* v. *Figueroa* (1986) 41 Cal.3d 714 [224 Cal.Rptr. 719, 715 P.2d 680], the Court of Appeal held that the materiality of allegedly perjurious statements was an element of the offense and thus a question for the jury to determine, and that the challenged portion of CALJIC No. 7.21 in effect directed a jury verdict on the element of materiality. The court further concluded, however, that *Figueroa* applied prospectively only, and that because the trial in this case occurred before *Figueroa* was decided, the instruction was not improper.

Each party challenges a separate aspect of the Court of Appeal's holding. The Attorney General disagrees with the court's conclusion that the element of materiality in a prosecution for perjury must be decided by the jury, rather than the court. Defendant, on the other hand, agrees with that holding, but contends that the court erred in not applying it to his case.

1. *Definition of Materiality Under the Political Reform Act*

■ To determine whether in this case the issue of materiality should have been submitted to the jury, we must first ascertain the meaning of the term "material," as used in the Act and in Penal Code section 118. The Act provides in relevant part: "Every person who signs and verifies any report or statement required to be filed under this title which contains *material* matter which he knows to be false is guilty of perjury." (Gov. Code, § 81004, italics added.) As authorized by this provision, the prosecution charged defendant with perjury in violation of Penal Code section 118, which in relevant part states that "every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which such testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as

---

[1] Penal Code section 118 prohibits both perjurious testimony under oath (the elements are set forth in CALJIC No. 7.20) and perjurious, signed declarations (covered by CALJIC No. 7.21).

true any *material* matter which he or she knows to be false, is guilty of perjury." (Italics added.)[2]

The meaning of the term "material" in the context of the Act has never been determined. Although we have in past decisions defined materiality in the context of perjury prosecutions based on false statements at trials and at legislative hearings (Pen. Code, § 118), those definitions are inappropriate here because they turn on whether the false statement could have "influenced the outcome of the proceedings." (*People* v. *Pierce* (1967) 66 Cal.2d 53, 61 [56 Cal.Rptr. 817, 423 P.2d 969] [perjury in a judicial proceeding]; *People* v. *Matula* (1959) 52 Cal.2d 591, 595 [342 P.2d 252] [perjury at a legislative hearing].) In a perjury prosecution based on the filing of a false SEI or CDS, on the other hand, there is no "proceeding" the outcome of which could be influenced by the false verification.

We reject the Attorney General's contention that because the Act requires candidates to disclose any contribution over $100 and requires office holders to report any source of income over $250, the failure to do so is inherently material. This approach would be of little assistance in determining whether a partial or inaccurate disclosure (e.g., a disclosure that misspelled the contributor's name, omitted the contributor's address, or misstated the amount of the contribution) is material. Such a definition would be so broad as to render the term virtually superfluous. Further, the Act provides less drastic sanctions for relatively minor violations.[3] We are persuaded that the legislation was intended to permit prosecution for perjury, a felony punishable by imprisonment for up to four years, only in cases involving more serious violations of the Act.

The United States Supreme Court's decision in *TSC Industries, Inc.* v. *Northway, Inc.* (1976) 426 U.S. 438 [48 L.Ed.2d 757, 96 S.Ct. 2126] (*TSC*) is instructive on the issue at hand. In that case, a company was sued by one of its shareholders for issuing an incomplete and materially misleading proxy statement, in violation of section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a) [hereafter section 14(a)]). Rule 14(a)(9) (17 C.F.R. § 240.14a-9), which implements section 14(a), bars proxy statements

---

[2] Defendant does not dispute, and properly so, that the *omission* of material information from a verified SEI or CDS constitutes an act of perjury, as is the case with the *inclusion* of materially inaccurate information.

[3] For instance, Government Code section 91000 provides that anyone who knowingly or wilfully violates any provisions of the Act is guilty of a misdemeanor, which is punishable by a term of up to six months in county jail (see Pen. Code, § 19) and a fine of either $10,000 or three times the amount that should have been properly reported, whichever is greater. In addition, Government Code section 91004 provides that any person who has intentionally or negligently violated any of the reporting provisions of the Act is liable for civil penalties in an amount not more than that not properly reported.

that are "false or misleading with respect to any *material* fact, or which omit[ ] to state any *material* fact necessary in order to make the statements therein not false or misleading. . . ." (Italics added.) In *TSC*, the United States Supreme Court held that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." (426 U.S. at p. 449 [48 L.Ed.2d at p. 766].) This definition, the court concluded, was consistent with the purpose underlying section 14(a), which is " 'to promote "the free exercise of the voting rights of stockholders" by ensuring that proxies would be solicited with an "explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." ' " (426 U.S. at p. 444 [48 L.Ed.2d at p. 763], citations omitted.)

Although *TSC* pertained to shareholder elections and this case involves elections to public office, in both contexts the statutory schemes specify the information that must be disclosed to the voters. Moreover, the statutory schemes have similar objectives. An underlying purpose of the disclosure requirements of the Act, as set forth in its preamble, resembles the rationale for the proxy disclosure requirements of section 14(a): "Receipts and expenditures in election campaigns should be fully and truthfully disclosed in order that the *voters may be fully informed* and improper practices may be inhibited." (Gov. Code, § 81002, subd. (a), italics added.) These similarities suggest that we should adopt a definition of materiality analogous to the one employed by the high court. But because the disclosure requirements of the Act serve an additional significant purpose, a broader definition of materiality is required here, as we shall explain.

Even after the election is over, the disclosure requirements of the Act continue to serve an important function. In requiring financial disclosures from current officeholders as well as from candidates for office, the Act not only helps the voters decide who to vote for in a particular election, but it also enables the public to determine whether their elected officials are free from conflicts of interest and are not abusing the power of their positions. This objective is reflected in the preamble to the Act, which declares: "Assets and income of public officials which may be materially affected by their official actions should be disclosed and in appropriate circumstances the officials should be disqualified from acting in order that conflicts of interest may be avoided." (Gov. Code, § 81002, subd. (c).) Thus, the definition of materiality must be broad enough to encompass this purpose as well.

We therefore conclude that, in a perjury prosecution based on a failure to comply with the disclosure provisions of the Act, an omission or misstatement of fact is material if there is a substantial likelihood that a reasonable person would consider it important in evaluating (1) whether a candidate

should be elected to, or retained in, public office, or (2) whether a public official can perform the duties of office free from any bias caused by concern for the financial interests of the official or the official's supporters.

## 2. *Determination of Materiality*

■ The Attorney General argues that materiality is a legal question that the trial court must resolve. Defendant responds that materiality is an element of the offense and therefore must be determined by the jury.

The principles governing the resolution of this issue are discussed in *People* v. *Figueroa, supra*, 41 Cal.3d 714. There, the defendant was convicted of selling unqualified securities, in violation of Corporations Code section 25110. We held that, in instructing the jury that certain "Corporation Promissory Notes" were "securities" within the meaning of the law, the trial court improperly removed an element of the crime from the jury's consideration. With respect to cases holding that the question of what constitutes a security was one of law reserved exclusively for the trial court, we observed that those decisions could not withstand scrutiny "under more modern concepts of due process and the right to a jury trial." (*Figueroa, supra*, at p. 731.) In concluding that the jury, not the court, must determine every element of the offense, we explained: " '[A] jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof . . . .' [¶] 'The judge . . . may not *instruct* the jury that as a matter of law some element of the crime charged has been adequately proved.' " (*Figueroa, supra*, at p. 726, italics in original.)

In *Figueroa,* we noted that in a perjury prosecution the accused historically has not been entitled to have the jury decide the question of materiality. We observed, however, that "the continuing vitality of [this rule] may be doubtful in light of *In re Winship* [1970] 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], and *Connecticut* v. *Johnson* [1983] 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969]." (*People* v. *Figueroa, supra*, 41 Cal.3d at p. 733, fn. 22.)

*Figueroa* did not abrogate the question-of-law/question-of-fact distinction in determining whether issues should be submitted to the jury. It did suggest, however, that this distinction plays a relatively limited role in view of a defendant's constitutional right to have a jury determine the existence of all elements of the offense charged. (*People* v. *Figueroa, supra*, 41 Cal.3d at p. 733.) Thus, the critical question here is whether materiality is an element of the offense of perjury in the context of the Act.

At oral argument, the Attorney General conceded that in this case materiality is an element of the offense. He nevertheless argued that materiality is

primarily a legal question best decided by the trial court, and that it is therefore "fundamentally different" from other elements. He contended that materiality constitutes an exception to the general rule that every element of the offense charged must be submitted to the jury. We disagree.

In a prosecution under the Act, the determination of materiality is not simply a question of law. Rather, it involves an evaluation of the significance of the defendant's statements or omissions, in the circumstances in which they were made. This is a task appropriately entrusted to the jury. (See *TSC Industries, Inc.* v. *Northway, Inc., supra*, 426 U.S. at p. 450 [48 L.Ed.2d at pp. 766-767].)

Apart from the offense of perjury, materiality is frequently a question for the jury. For example, in prosecutions for violations of federal securities laws proscribing "any untrue statement of a material fact or any omission to state a material fact" in the offer and sale of securities for the purpose of obtaining money, materiality is to be decided by the jury. (Devitt & Blackmar, Federal Jury Practice and Instructions (3d ed.) No. 54.08; see *Radiation Dynamics, Inc.* v. *Goldmuntz* (2d Cir. 1972) 464 F.2d 876, 888.) And in civil fraud actions in which the plaintiff must show a misrepresentation as to a material fact the jury determines what is material. (*Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 292-293 [85 Cal.Rptr. 444, 466 P.2d 996]; see BAJI Nos. 12.31, 12.35, 12.36, 12.40, 12.45 (7th ed. 1986 bound vol.); 37 C.J.S., Fraud, § 125, pp. 452-453.) We also note that in appropriate situations jurors in criminal cases may be instructed that "[a] witness willfully false in one *material* part of his testimony is to be distrusted in others." (CALJIC No. 2.21.2 (5th ed. 1988 bound vol.) italics supplied; *People* v. *Allison* (1989) 48 Cal.3d 879, 895 [258 Cal.Rptr. 208, 771 P.2d 1294].) This instruction requires the jury to determine what is material as part of the process of evaluating the testimony of a witness. Although the definition of "material" in these varied contexts may not be identical to that employed in perjury prosecutions under the Act, it is certainly similar, thus strongly suggesting the propriety of leaving the materiality determination in this case to the jury as well.

The Attorney General points out that for many years California courts have held that in a perjury prosecution materiality is a question of law to be determined by the court (*People* v. *Pierce, supra*, 66 Cal.2d 53, 61; *People* v. *Matula, supra*, 52 Cal.2d 591, 600; *People* v. *Lem You* (1893) 97 Cal. 224, 228 [32 P. 11]), and that this position is consistent with that of the great majority of other states. (See generally Annot., Materiality of Testimony Forming Basis of Perjury Charge as Question for Court or Jury in State Trial (1985) 37 A.L.R.4th 948.) The Attorney General also notes that in certain types of federal perjury prosecutions materiality is a matter for the

court's determination. (*Sinclair* v. *United States* (1929) 279 U.S. 263, 298 [73 L.Ed. 692, 699-670, 49 S.Ct. 268]; *Kungys* v. *United States* (1988) 485 U.S. 759, 760; but cf. *United States* v. *Taylor* (N.D.Cal. 1988) 693 F.Supp. 828.)

None of these cases, however, involves perjury prosecutions based on inaccurate or incomplete financial disclosures by officials or candidates for public office. As we have seen, the definition of materiality in prosecutions under the Act necessarily differs from its definition in other perjury cases. We express no view whether in perjury prosecutions based on false testimony at a judicial or legislative proceeding the question of materiality is a jury issue. We merely hold that in a perjury prosecution based on errors or omissions in disclosure statements required by the Act, materiality is an element of the offense, and must therefore be determined by the jury.

### 3. *Retroactivity*

The Attorney General contends that even if *People* v. *Figueroa, supra,* 41 Cal.3d 714, compels the conclusion that the jury, rather than the trial court, must determine the question of materiality, the decision should not be applied retroactively. Relying on the test enunciated in *People* v. *Guerra* (1984) 37 Cal.3d 385, 399-401 [208 Cal.Rptr. 162, 690 P.2d 635], the Attorney General contends *Figueroa* established a new rule of law, namely, that the question of materiality in perjury cases should be decided by the jury, and disapproved a prior rule to the contrary. He therefore asserts that, as set forth in *Guerra,* retroactivity should be determined by considering (1) the purpose of the new rule, (2) the extent of reliance on the old rule, and (3) the burden imposed on the administration of justice by retroactive application of the new rule. The Attorney General suggests that under this test *Figueroa* should not be applied retroactively. Because defendant's trial occurred before our decision in *Figueroa,* the Attorney General argues that the trial court properly reserved to itself the question of materiality, rather than submitting it to the jury.

Although *Figueroa* expressed doubt regarding the continuing validity of the rule that materiality is not a jury question (*People* v. *Figueroa, supra,* 41 Cal.3d at p. 733, fn. 22), that case did not present the issue of whether materiality is a question to be determined by the jury. Because *Figueroa* did not establish a new rule of law on the issue of materiality in perjury cases, we need not now determine whether that decision should be applied retroactively.

Nor is it necessary for us to determine now whether our holding in this case, that materiality presents a jury question in prosecutions under the

Act, should be applied retroactively to other cases.[4] ■ Defendant, as "'the individual . . . whose appeal is being adjudicated by the court,'" (*People* v. *Guerra, supra*, 37 Cal.3d at p. 401, fn. 15), is entitled to the benefit of the rule we announce today, regardless of its effect on other cases.

### 4. *Prejudice*

■ Having determined that the trial court in this case erred in not submitting the issue of materiality to the jury, we must now decide whether the error was prejudicial. We conclude it was.

■ Generally, when a trial court instructs the jury that an element of the offense charged is conclusively presumed, the effect of the error appears to be measured by the "harmless beyond a reasonable doubt" standard set forth in *Chapman* v. *California* (1967) 386 U.S. 18, 21 [17 L.Ed.2d 705, 709, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*Rose* v. *Clark* (1986) 478 U.S. 570, 577 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101]; *Carella* v. *California* (1989) 491 U.S. 263, 265 [105 L.Ed.2d 218, 221-222, 109 S.Ct. 2419, 2420-2421].) But when the error renders the trial "fundamentally unfair," the error is reversible per se. (*Rose* v. *Clark, supra*, 478 U.S. at pp. 577-578 [92 L.Ed.2d at pp. 470-471]; *People* v. *Hernandez* (1988) 46 Cal.3d 194, 210-211 [249 Cal.Rptr. 850, 757 P.2d 1013].) ■ Here, regardless of which test we apply, reversal is required. The factual questions presented to the jury were complex, the defense did not concede the issue of materiality, and the trial court's instruction completely deprived the jury of an opportunity to consider the materiality of defendant's omissions. Under these circumstances, we cannot say beyond a reasonable doubt that the instruction had no effect on the jury's verdict on the perjury offenses.

■ The same is not true, however, of defendant's conspiracy conviction. The jury specifically found that defendant conspired to commit each of five different offenses, only one of which was perjury. (The other four offenses were violations of provisions of the Act requiring that candidates disclose contributions in excess of $100 and that officeholders disclose sources of income over $250, and of San Diego Municipal Code Ordinances proscribing organizational campaign contributions and individual contributions of

---

[4] We note, however, that the continuing validity of *Guerra*'s test of retroactivity with respect to rulings based on the federal Constitution has been called into question by the high court's decision in *Griffith* v. *Kentucky* (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708], which holds that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." (*Id.* at p. 328 [93 L.Ed.2d at p. 661]; cf. *People* v. *Carrera* (1989) 49 Cal.3d 291, 327 [261 Cal.Rptr. 348, 777 P.2d 121] [declining to follow *Griffith* absent a violation of a federal constitutional right].)

more than $250.) Although the trial court's erroneous instruction on the issue of materiality invalidates the jury's finding that defendant conspired to commit perjury, the instruction did not affect the jury's findings that defendant conspired to commit the other offenses. Therefore, the validity of defendant's conspiracy conviction depends on our resolution of defendant's remaining contention, which is that the trial court erred in denying his motion for a new trial, based on allegations of jury tampering and misconduct, without conducting an evidentiary hearing on those issues.

## B. *Evidentiary Hearing on New Trial Motion Based on Bailiff and Jury Misconduct*

After his conviction, defendant moved for a new trial, based in part on allegations that Bailiff Allen Burroughs and some of the jurors committed acts of misconduct. He claimed that the misconduct took place during the jury's weeklong deliberations, when the jury was sequestered in a hotel under the supervision of Burroughs and his colleague, Holly Murlin. Defendant's motion was supported by declarations from Jurors Stanley Bohensky and Kathleen Saxton-Calderwood. In response, the prosecutor presented declarations from the remaining 10 jurors, as well as from both bailiffs.

### 1. *Evidence of Alleged Misconduct*

The allegations of misconduct can be broken down into two categories: attempts by Bailiff Burroughs to influence the jury's deliberation process, and the use of alcohol by the bailiffs and various jurors.

#### a. *Attempts to influence the jury's deliberative process*

Juror Bohensky stated in his declaration that during deliberations Bailiff Burroughs asked him to tell the other jurors that sequestration was expensive, that the jurors did not "have to be treated as nice as this," and that they should reach a quick verdict. Burroughs also said that the trial judge wanted to know whether the jurors were making progress. When Bohensky responded that Juror Pickering was causing problems, Burroughs told Bohensky to take notes "on what any unreasonable jurors" were saying.

Juror Bohensky also stated that on one occasion Bailiffs Burroughs and Murlin came to his hotel room and talked about their experiences with other juries and their ability to tell how the jurors would ultimately vote. They told Bohensky, "don't worry about Di Pickering, she'll come around, it's Kathy [Saxon-Calderwood] that you guys are going to have trouble with." A number of times Bailiff Burroughs said he did not care how the

verdict came out, as long as it came out "all one way or the other." In one instance, Burroughs attributed similar sentiments to the trial judge.

Juror Bohensky further asserted that one evening Bailiff Burroughs told several jurors about another case in which a juror claimed he had a reasonable doubt regarding the defendant's guilt because two witnesses had offered inconsistent testimony as to whether the defendant had worn a green hat. This led to a fistfight between the "holdout" juror and another juror. Bailiff Burroughs commented, "that shouldn't have been a hung jury; that was not reasonable doubt."

Juror Saxton-Calderwood stated in her declaration that she was present when Bailiff Burroughs related the "green hat" story. On another occasion she overheard Burroughs and another juror discuss who was holding up deliberations. More than once she heard Burroughs say there could be only two verdicts, guilty and not guilty. She expressed concern about these comments to Bailiff Murlin.

In opposition to the new trial motion, the prosecution submitted declarations by Jurors Bulman, Doherty, Dyer, Pierce, Ranck, and Rogers, all of whom said they heard Bailiff Burroughs tell the "green hat" story but did not believe its purpose was to illustrate the concept of reasonable doubt. Several of these jurors stated that Juror Saxton-Calderwood was at the other end of the room when Burroughs told the story.

The prosecution also presented affidavits by Jury Foreman Stark and the two bailiffs. Stark stated that Bailiff Burroughs told him jury sequestration was expensive and the jurors were expected "to make a decision."

In his declaration, Bailiff Burroughs denied telling Juror Bohensky that the jury should reach a speedy verdict, that the sequestration was costing the taxpayers a lot of money, or that the jury did not have to be treated "as nicely" as it was. Burroughs also denied telling any juror to take notes on what other jurors were saying, denied talking to Juror Bohensky about the status of the deliberations or the role of Juror Pickering in the deliberations, and denied telling Juror Saxton-Calderwood there could be only two verdicts.

Burroughs did admit telling the "green hat" story, but said he did so in response to inquiries by jurors about incidents of violence among jurors in other cases. He did not believe that Juror Saxton-Calderwood could have overheard the story. Afterwards, one juror asked if he thought there had been a reasonable doubt in the "green hat" case. Burroughs responded he could not answer that or any other question on the law.

In her declaration, Bailiff Murlin denied that she and Bailiff Burroughs told Juror Bohensky they could predict how the jurors would ultimately vote, and denied discussing with Bohensky the role of Jurors Pickering and Saxton-Calderwood in the deliberations. Murlin confirmed that Saxton-Calderwood told her about a statement by Bailiff Burroughs that there could be only two verdicts. When Murlin suggested that Saxton-Calderwood report this to the judge, the juror responded that the matter was unimportant.

b. *Alcohol consumption*

In their declarations, Jurors Bohensky and Saxton-Calderwood stated that Bailiff Burroughs provided the jurors with alcohol when they were not deliberating. Bohensky described a birthday party one night for Bailiff Murlin: Bohensky went to his room between 10:30 and 11:00 p.m. but could not sleep; when he still heard voices in the deliberation room, he went there and was let in by Bailiff Burroughs, who said the Kahlua was gone but he still had vodka and grapefruit juice; Burroughs then produced a half-gallon bottle of vodka, and Bohensky had several drinks. The next day, which was the final day of deliberations, Juror Dyer was so "hung over" she had to go to the bathroom every 15 minutes to vomit.[5]

In declarations the prosecution submitted in opposition to the new trial motion, several other jurors confirmed that members of the jury had consumed small quantities of alcoholic beverages in the evenings after deliberations. Juror Dyer denied being "hung over" on the final day of deliberations. She acknowledged being sick to her stomach, but said her mental processes were not affected. The declarations of Bailiffs Murlin and Burroughs were silent on the use of alcohol by themselves or the jurors; nor did

---

[5] In declarations attached as exhibits to a petition for writ of habeas corpus that the Court of Appeal consolidated with this appeal, Jurors Saxton-Calderwood and Bohensky both declared that Juror Dyer spent most of the last day of deliberations (the day after the late-night drinking session mentioned in Juror Bohensky's original declaration) on a sofa in the deliberation room with a pillow over her head. Bohensky also expanded on the events of the night before, stating that several jurors became intoxicated and that among those drinking that night were Jurors Dyer, Rogers and Pierce.

The petition also contained a declaration from appellate counsel that he had talked to a juror who informed him that a hangover caused by heavy drinking, combined with a lack of sleep, had influenced that juror's judgment on the last day of jury deliberations. The juror recalled discussing this with representatives of the Attorney General's office who were investigating the allegations of bailiff misconduct. The juror did not wish to execute an affidavit to this effect because of embarrassment.

The Court of Appeal disposed of the petition for writ of habeas corpus by directing the issuance of an alternative writ, returnable before the Superior Court of San Diego County. Although our grant of review included the petition for writ of habeas corpus, the Court of Appeal's order on the writ is unaffected by this opinion.

they address the allegation that Burroughs had provided the jurors with alcohol.

In support of his motion for a new trial, defendant attempted to subpoena all the jurors to have them testify regarding the alleged misconduct. The trial court refused to hold an evidentiary hearing, and quashed all subpoenas. Its written order stated: "The [new trial] hearing will be conducted upon the declarations of the twelve trial jurors and whatever other evidence is submitted at the time of the hearing. The Court will not hear testimony from any of the trial jurors, based upon the law as established in *Linhart* v. *Nelson* (1976) 18 Cal.3d 641 [134 Cal.Rptr. 813, 557 P.2d 104], *People* v. *Scott* (1982) 129 Cal.App.3d 301 [180 Cal.Rptr. 891], and *Garcia* v. *Superior Court* (1984) 156 Cal.App.3d 670 [203 Cal.Rptr. 290]." The court denied defendant's motion for a new trial.

### 2. *Evidentiary Hearing on Allegations of Misconduct*

The Court of Appeal determined that the trial court abused its discretion by refusing to hold an evidentiary hearing at which the jurors could have testified about the facts pertinent to the jury misconduct allegations raised in defendant's motion for a new trial. In so holding, the court addressed three issues, resolving each in defendant's favor. It held: (1) in a criminal case the trial court may conduct an evidentiary hearing to resolve factual issues presented by a new trial motion based on allegations of juror misconduct; (2) at such a hearing jurors may testify; and (3) under the facts of this case, the trial court abused its discretion when it refused to conduct such a hearing.

In reaching the first conclusion, the Court of Appeal distinguished *Linhart* v. *Nelson* (1976) 18 Cal.3d 641 [134 Cal.Rptr. 813, 557 P.2d 104]. We agree that *Linhart* is distinguishable. In that case, we held that in civil cases a motion for a new trial based on allegations of jury misconduct must be presented solely by affidavit, without the testimony of witnesses. We based our holding on Code of Civil Procedure section 658, which provides that a motion for a new trial based on alleged jury misconduct "must be made upon affidavits," thus precluding the use of other types of evidence. (18 Cal.3d at p. 645.)

■ But Code of Civil Procedure section 658 does not apply to criminal trials. And in *People* v. *Pierce* (1979) 24 Cal.3d 199 [155 Cal.Rptr. 657, 595 P.2d 91], we indicated that in a criminal case a trial court may permit testimony at a hearing on a motion for a new trial. In *Pierce,* the defendant moved for a new trial, alleging misconduct by a juror who had discussed the case with a police officer who was a prosecution witness. In denying the motion, the trial court relied solely on investigatory reports prepared by the police. We reversed, holding that the trial court had used an incorrect

standard of prejudice in denying the motion for a new trial, and that the motion had raised a presumption of prejudice which the People failed to rebut. In a footnote, we said: "[W]e strongly disapprove of the substitution of unsworn police reports and summaries for affidavits or testimony of the percipient witnesses. *A hearing in open court would have been particularly appropriate to ascertain the relevant facts in this matter, because* [*the juror and police officer*] *were initially evasive about the scope and content of their conversation.* (But cf. *Linhart* v. *Nelson* (1976) 18 Cal.3d 641 [134 Cal.Rptr. 813, 557 P.2d 104] [stating rule in civil cases].)" (*People* v. *Pierce, supra*, 24 Cal.3d 199, 206, fn. 3, italics added.)

We now reaffirm the conclusion we reached in *People* v. *Pierce, supra*, 24 Cal.3d 199: when a new trial motion in a criminal case is based on allegations of juror misconduct, the trial court may conduct an evidentiary hearing to determine the truth of the allegations. Our reasons follow.

Penal Code section 1181 enumerates the grounds for motions for new trials in criminal cases. One of these grounds is: "3. When the jury has . . . been guilty of any misconduct by which a fair and due consideration of the case has been prevented . . . ." Nothing in the language of Penal Code section 1181 suggests that the motion is to be supported by affidavit only, nor does the Penal Code contain any provisions analogous to Code of Civil Procedure section 658, setting forth the procedure for making the motion.

The Attorney General nevertheless maintains that Penal Code section 1181 "contains language requiring that the newly discovered evidentiary material concerning juror misconduct 'must' be produced in an 'affidavit.'" He is apparently referring to subdivision 8 of the statute, which provides that, when a new trial motion is based on newly discovered evidence that the defense could not have discovered and produced at trial, "the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given . . . ." This language merely establishes that such affidavits are a prerequisite to a new trial motion based on newly discovered evidence. It has no bearing on a motion for a new trial based on jury misconduct, which is covered in subdivision 3 and is at issue here.

Accordingly, we hold that, when a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact.

The Attorney General argues that even if the trial court may order such a hearing, only nonjurors may be called as witnesses. We disagree.

In virtually every state that permits the introduction of evidence from jurors, as well as in the federal courts, such evidence may be presented by testimony at an evidentiary hearing. (See, e.g., *People* v. *Collins* (Colo. 1986) 730 P.2d 293, 302; *Wilson* v. *United States* (App.D.C. 1977) 380 A.2d 1001, 1004; *Amazon* v. *State* (Fla. 1986) 487 So.2d 8, 11; *Commonwealth* v. *Fidler* (1979) 377 Mass. 192 [385 N.E.2d 513]; *People* v. *Brown* (1979) 48 N.Y.2d 388 [423 N.Y.S.2d 461, 462]; *Commonwealth* v. *Syre* (1986) 513 Pa. 1 [518 A.2d 535]; *State* v. *Blackwell* (Tenn. 1984) 664 S.W.2d 686, 688; *State* v. *Murphy* (1986) 44 Wn.App. 290 [721 P.2d 30, 33-34]; *State* v. *Poh* (1984) 116 Wis.2d 510 [343 N.W.2d 108]; *People* v. *Brown* (1979) 48 N.Y.2d 388 [423 N.Y.S.2d 461, 399 N.E.2d 51]; *State* v. *Jenkins* (1984) 15 Ohio St.3d 164 [473 N.E.2d 264, 325]; *People* v. *Porter* (1986) 111 Ill.2d 386 [489 N.E.2d 1329].)

The federal courts have permitted jurors to testify regarding allegations of jury misconduct since the high court's decision in *Remmer* v. *United States* (1954) 347 U.S. 227 [98 L.Ed. 654, 74 S.Ct. 450]. In *Remmer*, an unnamed person told a juror that he "could profit by bringing in a verdict favorable to the [defendant]." The juror mentioned this to the trial judge, who in turn told the prosecutor but not the defense. After an investigation, the Federal Bureau of Investigation concluded that the statement had been made in jest, and nothing further was done. After trial, defense counsel learned of the incident and made a motion for a new trial, which was supported by affidavits. The trial court denied the motion. The United States Supreme Court held this to be error, stating: "The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." (347 U.S. at pp. 229-230 [98 L.Ed at p. 655].) The Federal Rules of Evidence, enacted after *Remmer* was decided, specifically allow the admission of juror testimony to challenge the jury's verdict.[6] Many states have enacted statutes almost identical to the federal rule.[7]

---

[6] Federal Rules of Evidence, rule 606(b) provides: "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that *a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes." (Italics added.)

[7] See 8 Wigmore, Evidence (McNaughton ed., 1989 pocket supp.) section 2354, pages 183-186, stating that similar rules of evidence have been adopted in Alaska, Arizona, Colorado,

Some states still do not allow the introduction of any evidence of misconduct emanating from jurors themselves. (See 8 Wigmore, Evidence (McNaughton ed. 1961) §§ 2352-2355, pp. 695-723.) But these jurisdictions do not distinguish between evidence presented by affidavit and evidence presented through testimony. Rather, they preclude jurors from presenting evidence in any form whatsoever, on the theory that a juror should not be permitted to assert his or her own misconduct. This doctrine, originally enunciated by Lord Mansfield in *Vaise* v. *Delaval* (1785 K.B.) 99 Eng. Rep. 944, has been widely criticized (see *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 347, fn. 2 [78 Cal.Rptr. 196, 455 P.2d 132]), and has been either abandoned or substantially limited by the federal courts and by most jurisdictions that have considered the subject in recent years. (See 8 Wigmore, Evidence (McNaughton ed., 1989 pocket supp.) § 2354, pp. 183-186; Mueller, *Jurors' Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b)* (1978) 57 Neb.L.Rev. 920, 924-925.)

There are substantial advantages to a rule recognizing the trial court's discretion to order an evidentiary hearing at which jurors may testify. Most important, when compared to the use of affidavits, a hearing at which witnesses testify and are subject to cross-examination is a more reliable means of determining whether misconduct occurred. As observed in *Ryan* v. *United States* (D.C. Cir. 1951) 191 F.2d 779, 781 [189 App.D.C. 328]: "If the use of affidavits be thought a doubtful method for getting at the facts [citations], hearing witnesses on examination and cross-examination is free of such doubt." And, as Justice O'Connor noted in her concurring opinion in *Smith* v. *Phillips* (1982) 455 U.S. 209, 222 [71 L.Ed.2d 78, 89, 102 S.Ct. 940]: "A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case."

Permitting jurors to testify at an evidentiary hearing is consistent with procedures at other stages of criminal proceedings. For example, if during a trial the court becomes aware of possible juror misconduct, it must "make whatever inquiry is reasonably necessary to determine if the juror should be discharged . . . ." (*People* v. *Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251].) Inherent in the court's power to make this

Delaware, Minnesota, Mississippi, Montana, North Dakota, Ohio, Oklahoma, South Dakota, Texas, Wisconsin, and Wyoming.

inquiry is its discretion to examine jurors under oath. And we have suggested that jurors may be called to testify in habeas corpus proceedings initiated in California state courts. (See *In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260].)[8]

The Attorney General argues that allowing counsel to interrogate unwilling trial jurors might encourage prospective jurors to seek to be excused from jury service. But, as we have noted, many other jurisdictions permit jurors to testify, and we are unaware that they have encountered an increase in the number of prospective jurors seeking to be excused. The Attorney General also contends that to subject jury deliberations to compulsory disclosure could stifle independent thought and debate by jurors. (See *Linhart v. Nelson, supra*, 18 Cal.3d at pp. 644-645.) This concern can appropriately be accommodated.

First, to avoid a chilling effect on the jury's deliberations, a trial court may decline to require jurors to testify when the testimony will relate primarily to the *content* of the jury deliberations. Alternatively, the court may conduct most or all of the questioning of jurors itself, as is frequently done when allegations of misconduct arise in the course of trial, thereby ensuring that unnecessarily intrusive questions will not be asked. In addition, the danger that jurors' independent thought and debate will be threatened is in large part allayed by Evidence Code section 1150, subdivision (a). That statute provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

We emphasize that, when considering evidence regarding the jurors' deliberations, a trial court must take great care not to overstep the boundaries set forth in Evidence Code section 1150. The statute may be violated not only by the admission of jurors' testimony describing their own mental processes, but also by permitting testimony concerning statements made by

---

[8] At issue in *Stankewitz* was whether evidence could be received from jurors regarding statements made within the jury room. We concluded this was permissible provided it was not directed at "the subjective reasoning processes of the individual juror." (*In re Stankewitz, supra*, at p. 398, quoting from *People v. Hutchinson, supra*, 71 Cal.2d 342, 346.) Although the opinion did not analyze the form this evidence could take, we did state that "jurors may *testify* to such statements." (*Stankewitz, supra*, at p. 398, citing *People v. Pierce, supra*, 24 Cal.3d 199, italics added.)

jurors in the course of their deliberations. In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible. (*In re Stankewitz, supra*, 40 Cal.3d at p. 398.) But when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150.

For the reasons set forth above, we hold that it is within the discretion of a trial court to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing.[9] This does not mean, however, that a trial court must hold an evidentiary hearing in every instance of alleged jury misconduct. The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.

With these concerns in mind, we now consider whether in this case the trial court had the discretion to conduct an evidentiary hearing in which jurors could be compelled to testify. We conclude that it did.

The allegations of misconduct were based primarily on incidents that occurred outside the jury room. The affidavits presented material factual conflicts; cross-examination could have assisted the trial court in resolving the disputed evidence. Furthermore, all the jurors had executed affidavits regarding the allegations; to some extent, therefore, the jurors were already involved in the proceedings. Under these circumstances, an evidentiary hearing would have been less of an intrusion on the privacy of the jurors than in the case of jurors unwilling to discuss the matter with investigators.

The alleged misconduct was of a serious nature. If Bailiff Burroughs did make the remarks that Jurors Bohensky and Saxton-Calderwood attributed to him, those remarks were presumptively prejudicial (*People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]) and of a character "likely to have influenced the verdict improperly" (*People* v. *Hutchinson, supra*, 71 Cal.2d at p. 351; Evid. Code, § 1150, subd. (a)). As the United States Supreme Court has observed, "the official character of the bailiff—as an officer of the court as well as the State—beyond

---

[9] To the extent it is inconsistent with this conclusion, *People* v. *Scott* (1982) 129 Cal.App.3d 301 [180 Cal.Rptr. 891] is disapproved.

question carries great weight with a jury . . . ." (*Parker* v. *Gladden* (1966) 385 U.S. 363, 365 [17 L.Ed.2d 420, 423, 87 S.Ct. 468].) Therefore, any comment by a bailiff that is likely to influence the deliberative processes of the jury constitutes serious misconduct. We urge trial courts to remind their bailiffs of the importance of their role as guardians of the integrity of the jury's deliberative process and to caution them to limit their communications with jurors to the bare essentials and to make no statement that a juror might construe as relating to the merits of the case, the interpretation of legal rules, or the nature of the deliberative process. The need for such caution is particularly acute when, as here, the jury is sequestered and will be under the bailiffs' care and supervision for an extended time.

 Equally serious were the allegations of alcohol use. According to the affidavits submitted by the defense, one of the bailiffs provided members of the jury with large quantities of alcohol, as a result of which one juror was unable to participate in the deliberations on the day the jury arrived at a verdict. Although jurors are under no duty to abstain from the use of alcoholic beverages when they are not deliberating, here the affidavits allege that the consumption of alcohol rendered the juror unable to competently perform her duties. (See *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 412 [185 Cal.Rptr. 654, 650 P.2d 1171].) If true, this episode established misconduct, giving rise to a presumption of prejudice.

In concluding that the trial court abused its discretion by failing to conduct an evidentiary hearing at which jurors could be subpoenaed to testify, the Court of Appeal mischaracterized the trial court's ruling. As demonstrated by its written ruling (*ante*, at p. 414), the trial court mistakenly believed that under *Linhart* v. *Nelson, supra*, 18 Cal.3d 641, it had no authority to hold an evidentiary hearing; thus it never exercised its discretion. Under these circumstances, the order denying defendant's motion for a new trial must be reversed.

On remand, the trial court must exercise its discretion to determine whether an evidentiary hearing is necessary to resolve the allegations of juror misconduct, and whether jurors may be subpoenaed to testify at this hearing.[10] Because we have already determined that defendant's convictions for perjury must be reversed, any evidentiary hearing would address only whether defendant is entitled to a new trial on his conspiracy conviction. If

---

[10] In exercising its discretion, the trial court may consider the original affidavits submitted both in support of and in opposition to defendant's new trial motion, as well as any additional affidavits the parties wish to present. The Court of Appeal held that on remand the prosecution had to furnish the defense with discovery regarding the investigation it conducted into the allegations of misconduct. Our grant of review did not encompass the propriety of this ruling, which thus remains unaffected by this opinion.

the trial court denies the motion for a new trial on the conspiracy conviction, it should enter judgment on that conviction. At this time, we need not determine whether it would be an abuse of discretion to deny defendant such a hearing.[11]

## DISPOSITION

We reverse the judgment of the Court of Appeal, and direct that court to remand the matter to the trial court for further proceedings consistent with this opinion.

In the habeas corpus proceeding, we affirm the Court of Appeal's order directing the issuance of an alternative writ returnable before the superior court.

Mosk, J., Broussard, J., and Arabian, J., concurred.

**PANELLI, J.,** Concurring.—I concur in the majority opinion except for part A.1 of the discussion, which concerns the definition of materiality in prosecutions for perjury under the Political Reform Act of 1974. In my view, the first of the majority's two definitions is so subjective that it will be difficult to apply fairly or predictably. According to the majority, "an omission or misstatement of fact is material if there is a substantial likelihood that a reasonable person would consider it important in evaluating (1) whether a candidate should be elected to, or retained in, public office, . . ." (Maj. opn., *ante,* at pp. 406-407.) The problem is that a reasonable person may properly consider *anything* to be important in evaluating whether a candidate should be elected to public office. The law gives citizens, acting in the capacity of voters, absolutely unrestricted and unreviewable discretion to vote for or against a candidate for any reason whatsoever, even for an invalid reason (e.g., race, sex, religion) that would offend constitutional principles if used as the basis for another decision. A juror asked to apply this standard to determine whether a candidate's omission from a disclosure statement was "material" is asked, essentially, to consult his subjective biases.

In my view, the source of the problem is the majority's effort to make too much of the analogy to proxy statements. (See maj. opn., *ante,* at pp. 405-406.) In the context of economic behavior it made sense for the United

---

[11] We reject defendant's contention, made at oral argument, that because of the difficulty in relocating the jurors for a possible evidentiary hearing several years after the completion of the trial, we should direct the trial court to grant his motion for new trial. At this point, the claim that the parties may be unable to locate the jurors is entirely speculative and premature. In any event, defendant has presented no persuasive authority that he would be entitled to such relief.

States Supreme Court, interpreting the federal securities laws, to refer to a hypothetical "reasonable shareholder"—an ordinarily risk-averse investor motivated by the desire to maximize value. (See *TSC Industries, Inc.* v. *Northway, Inc.* (1976) 426 U.S. 438, 449 [48 L.Ed.2d 757, 766, 96 S.Ct. 2126].) In contrast, there does not exist an objective standard by which we can measure the reasonableness of a person's behavior as a voter.

The analogy to proxy statements involves other difficulties, as well. Unlike a candidate's financial disclosure statement, a proxy statement is intended to solicit votes. Accordingly, a candidate for a corporation's board of directors may discuss in a proxy statement such things as the candidate's experience, the corporation's business plans, and other subjects of relevance to the question of who should run the company. In this broad context it made sense for the high court to hold that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." (*TSC Industries, Inc.* v. *Northway, Inc., supra*, 426 U.S. at p. 449 [48 L.Ed.2d at p. 766].)

A campaign disclosure statement has a much more limited purpose; it definitely is *not* a solicitation for votes. The Political Reform Act requires only disclosures related to financial matters and repeatedly informs us that the purpose of doing so is to inhibit "improper practices" (Gov. Code, § 81002, subd. (a)), to avoid "conflicts of interest" (*id.*, § 81002, subd. (c)), and to ensure that officials "perform their duties in an impartial manner, free from bias caused by their own financial interests or the financial interests of persons who have supported them" (*id.*, § 81001, subd. (b)).

Perhaps the majority's treatment of the materiality issue is motivated by the desire to make the candidate's disclosure statement more than it was intended to be. One senses this in the majority's reliance on Government Code section 81002, subdivision (a), which mentions the goal of "fully informing" the voters. (Maj. opn., *ante,* at p. 406.) But that statute, read in context, does not fairly imply a purpose beyond the revelation of financial improprieties.[1]

Financial disclosure has a history in this state which the majority does not consider. In *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 269 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313], we held a predecessor of the Political Reform Act unconstitutionally vague because it required disclosure of assets "without regard to the nature or locale of the asset or whether it bears the remotest relation to the duties of the public office

---

[1] "*Receipts and expenditures* in election campaigns should be fully and truthfully disclosed in order that voters may be fully informed *and improper practices may be inhibited*." (Gov. Code, § 81002, subd. (a), italics added.)

. . . ." Informed by our decision in that case, the Legislature and the people subsequently approved financial disclosure requirements closely tailored to the goal of preventing conflicts of interest and other financial improprieties. (See *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 671 [114 Cal.Rptr. 345, 522 P.2d 1345] [interpreting former Gov. Code, § 3600 et seq.]; Political Reform Act of 1974, added by initiative measure approved by the electors at the Primary Elec. of June 4, 1974 [codified as Gov. Code, § 81000 et seq.].)

With its subjective definition of "materiality," the majority appears to endorse a concept of disclosure even broader than that which we rejected in *City of Carmel-by-the-Sea* v. *Young, supra*, 2 Cal.3d 259. Under the Political Reform Act, "[e]very person who signs and verifies any report or statement required to be filed under this title which contains *material matter* which he knows to be false is guilty of perjury." (Gov. Code., § 81004, subd. (b).) According to the majority, materiality is now to be decided by 12 jurors, instructed to decide whether voters would have considered the candidate's omission or misstatement important in deciding how to vote. While I do not doubt the Legislature's, or the people's, constitutional power to broaden the disclosure that candidates for public office are required to make, we should not do so ourselves.[2]

**EAGLESON, J.,** Concurring and Dissenting.—I concur in part B of the majority opinion and the disposition thereunder: reverse and remand for the trial court to exercise discretion to determine whether an evidentiary hearing is necessary to resolve the juror misconduct claim and, if so, whether jurors should be subpoenaed to testify at such a hearing. (Maj. opn., *ante*, at pp. 411-421.)

I respectfully dissent from the analysis and conclusions reached in part A of the majority opinion, which holds that the materiality element of the offense of perjury, when prosecuted pursuant to the Political Reform Act of 1974 (hereafter the Act), must be determined by the jury. (Maj. opn., *ante*, at pp. 403-411.)

---

[2] Rather than borrow a standard of materiality from federal securities law, I would defer to the electorate by looking to the Political Reform Act, itself. The people, in their "[f]indings and declaration," clearly articulated the fundamental purpose of financial disclosure: "Public officials, whether elected or appointed, should perform their duties in an impartial manner, free from bias caused by their own financial interests or the financial interests of persons who have supported them." (Gov. Code, § 81001, subd. (b).)

Faithful to the intent of the act, one might instruct jurors about materiality as follows, essentially in the statutory language: "A false statement in a required report is material if it is of substantial importance in determining whether a [public official is] [candidate would be] able to perform the duties of his or her office free from bias caused by his or her own financial interests or the financial interests of persons who have supported him or her."

## Materiality as an "Element" of Perjury

The majority opinion asks: "in a perjury prosecution based on errors or omissions in disclosure statements required by the Act, is the materiality of the errors or omissions an element of the offense to be determined by the jury?" (Maj. opn., *ante*, at p. 399.) The majority then endeavors to demonstrate, assertedly as a question of first impression, why "materiality" is in fact an "element" of the offense of perjury *when authorized under the Act.*[1] An entire section of the opinion is devoted to the resolution of this question. (*Id.*, at pp. 407-409.) The majority states that "[t]he Attorney General argues that materiality is a legal question that the trial court must resolve" (*id.*, at p. 407), and asserts: "the critical question here is whether materiality is an element of the offense of perjury in the context of the Act." (*Id.*, at p. 407.)

With all due respect, insofar as the word "material" is found in the language of the statute defining the crime of perjury (Pen. Code, § 118) *under which these offenses were charged,* it is plainly, in a definitional, threshold sense, an "element" or "requirement"[2] of the offense of perjury.

Our order granting review in this case acknowledged as much in designating one of the issues on review: "Is the *materiality element* of the crime of perjury a legal question for the court or a factual question for the jury?" (Italics added.) As the majority notes, at oral argument the Attorney General agreed that "materiality" is an element of the offense of perjury in this case. (Maj. opn., *ante*, at pp. 407-408.) However, he relied upon a long line of federal authority in support of his position that "the *materiality element* in a perjury case is 'one for the court.' " (Italics added.) This is the nub of the issue.

It is not a function of this or any other court to establish what is or is not an "element" of a Penal Code offense. Defining crimes and their elements is fundamentally a legislative function. We may, of course, seek to "clarify" the element or requirement of "materiality" in the statutory language defining the offense of perjury—by construing the legislative intent underlying use of that term or, arguably, by looking to the provisions of the Act which authorize perjury prosecutions based on violations of the Act. (See, e.g., Gov. Code, §§ 81002, subds. (a) & (c).) Such *clarification,* however, does not "somehow become an 'element' of [the offense] on which the jury

---

[1] The majority "express[es] no view" on whether the materiality requirement in all other perjury prosecutions brought under Penal Code section 118 is a "jury issue." (Maj. opn., *ante,* at p. 409.)

[2] Witkin refers to the "materiality requirement" of the offense of perjury. (See 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 1186, at p. 1367.)

must be instructed in all cases regardless of whether the *evidence* supports such an instruction." (*People* v. *Kimble* (1988) 44 Cal.3d 480, 501 [244 Cal.Rptr. 148, 749 P.2d 803], italics in original [rejecting the "novel suggestion" that this court's *clarification* of the scope of the felony-murder special circumstance created or established a new "element," and citing a long line of authority commencing with *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1139-1140 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], which explains that the mere act of "clarifying" the scope of an element of a crime or a special circumstance does not create a new and separate element of that crime or special circumstance].)

I believe the majority overstates its function by purporting to "hold," as a matter of first impression, that materiality is an element of a limited category of perjury prosecutions: those brought pursuant to the Act.

### WHO DETERMINES MATERIALITY—JUDGE OR JURY?

In *People* v. *Figueroa* (1986) 41 Cal.3d 714 [224 Cal.Rptr. 719, 715 P.2d 680], defendant was convicted of selling unqualified securities in violation of Corporations Code section 25110. We held in that case that by instructing the jury that certain corporate promissory notes were "securities" within the meaning of the statute, the trial court had improperly removed an element of the crime from the jury's consideration. With respect to a long line of California appellate court decisions holding that the question of what constitutes a security was one of law to be determined by the trial court, we observed that those decisions could not withstand scrutiny "under more modern concepts of due process and the right to a jury trial." (*Id.*, at p. 731.)

In reaching this conclusion in *Figueroa* we further observed, in dictum relegated to a footnote, that although there is a well-recognized "historical exception" for perjury prosecutions—in which the determination of the materiality requirement has long been deemed a question of law reserved exclusively for the trial court—"the continuing validity of [this rule] may be doubtful in light of *In re Winship* [(1970)] 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], and *Connecticut* v. *Johnson* [(1983)] 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969]." (*Figueroa, supra,* 41 Cal.3d at p. 733, fn. 22.)

As early as 1929, however, the United States Supreme Court held that the materiality requirement in a prosecution for perjury was a question of law to be determined by the trial court. (*Sinclair* v. *United States* (1929) 279 U.S. 263, 298 [73 L.Ed. 692, 699-700, 49 S.Ct. 268] [materially false statement made to a governmental agency].) The rationale of *Sinclair* became

the basis for numerous state court decisions adopting the rule that materiality in a perjury prosecution is a question of law for the court.

The decisions of this court that are in accord with the general rule include *People v. Pierce* (1967) 66 Cal.2d 53, 61 [56 Cal.Rptr. 817, 423 P.2d 969], and *People v. Matula* (1959) 52 Cal.2d 591 [342 P.2d 252]. Indeed, 36 years prior to the high court's decision in *Sinclair,* this court wrote: "The question of materiality of evidence, no matter when or how it may arise, is always one of law for the court, and not of fact for the jury. It usually arises in the ordinary trial of a cause, where one party offers evidence, and the other objects to it as immaterial; and in that case it would be clear to every one that the question was for the court. But the question is exactly the same when, on a trial for perjury, the materiality of the alleged false testimony arises. Of course, a jury, in rendering a general verdict in a criminal case, necessarily has the naked *power* to decide all the questions arising on the general issue of not guilty; but it only has the right to find the facts, and apply to them the law as given by the court. And on a trial for perjury, it is the duty of the court to instruct the jury as to what facts would show material testimony." (*People v. Lem You* (1893) 97 Cal. 224, 228 [32 P. 11]; see also *People v. Bradbury* (1909) 155 Cal. 808 [103 P. 215]; 2 Witkin & Epstein, Cal. Criminal Law, *supra*, § 1188, at p. 1369.)

The decisions of this state's Court of Appeal have also long been in accord with this general rule. (See, e.g., *People v. McRae* (1967) 256 Cal.App.2d 95 [63 Cal.Rptr. 854]; *People v. Sagehorn* (1956) 140 Cal.App.2d 138 [294 P.2d 1062]; *People v. Brophy* (1942) 49 Cal.App.2d 15 [120 P.2d 946]; *People v. Curtis* (1939) 36 Cal.App.2d 306 [98 P.2d 228]; *People v. Macken* (1939) 32 Cal.App.2d 31 [89 P.2d 173]; *People v. Phillips* (1922) 56 Cal.App. 291 [205 P. 40]; *People v. Senegram* (1915) 27 Cal.App. 301 [149 P. 786]; *People v. Chadwick* (1906) 4 Cal.App. 63 [87 P. 384].)

And, as the majority has recognized, "the great majority of other states" adhere to the rule that the question of materiality is one of law for the court. (Maj. opn., *ante,* at p. 408; see, e.g., *Jaffe v. State* (Fla. Dist. Ct. App. 1983) 438 So.2d 72, 75-76; *People v. Powell* (1987)160 Ill.App.3d 689 [513 N.E.2d 1162, 1166]; *People v. Hoag* (1982) 113 Mich.App. 789 [318 N.W.2d 579, 583]; *State v. Sands* (1983) 123 N.H. 570 [467 A.2d 202, 215-216]; *State v. Gallegos* (1982) 98 N.M. 31 [644 P.2d 545, 546]; *State v. Hanson* (N.D. 1981) 302 N.W.2d 399, 401; *Yarbrough v. State* (Tex.Crim.App. 1981) 617 S.W.2d 221, 228; *State v. Strand* (Utah 1986) 720 P.2d 425, 431; see also Annot., Materiality of Testimony Forming Basis of Perjury Charge as

Question for Court or Jury in State Trial (1985) 37 A.L.R.4th 948, 953-958.)[3]

The Ninth Circuit has followed the general rule in *United States* v. *Dipp* (9th Cir. 1979) 581 F.2d 1323, 1328. And one federal circuit court has observed: "The unanimous verdict of the federal courts has been that materiality is a question of law to be determined by the trial judge." (See *United States* v. *Bridges* (D.C. Cir. 1983) 717 F.2d 1444, 1448.)[4]

In *Russell* v. *United States* (1962) 369 U.S. 749, 755-759 [8 L.Ed.2d 240, 245-248, 82 S.Ct. 1038], and *Braden* v. *United States* (1961) 365 U.S. 431, 435-438, and footnote 6 [5 L.Ed.2d 653, 655-656, 81 S.Ct. 584], the United States Supreme Court reaffirmed the rule that the element of materiality in a perjury prosecution is "one for the court," announced over 50 years ago in *Sinclair.*

But most significantly, very recently, in *Kungys* v. *United States* (1988) 485 U.S. 759 [99 L.Ed.2d 839, 108 S.Ct. 1537], a case decided well after *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], and *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969], the high court yet again reaffirmed the continuing validity of the "historical exception" recognized for perjury prosecutions. (*Sinclair* v. *United States, supra,* 279 U.S. at p. 298 [73 L.Ed. at pp. 699-700].) In adopting the reasoning of a Sixth Circuit case construing the element of "materiality" found in 18 United States Code section 1001 (see, *ante,* this page, fn. 4), the high court explained:

" '[A]lthough the materiality of a statement rests upon a factual evidentiary showing, the ultimate finding of materiality turns on an interpretation of substantive law. Since it is the court's responsibility to interpret substantive law, we believe [it is proper to treat] the issue of materiality as a legal question.' *United States* v. *Abadi* [(6th Cir. 1983)] 706 F.2d 178, 180, cert. denied, 464 U.S. 821 (1983)." (*Kungys* v. *United States, supra,* 485 U.S. at p. 772 [99 L.Ed.2d at p. 854].)

---

[3] My research has uncovered only three jurisdictions in which the materiality element of perjury has been held a jury question. (See, e.g., *Com.* v. *McDuffee* (1979) 379 Mass. 353 [398 N.E.2d 463] [Mass.]; *Pope* v. *State* (1931) 43 Ga.App. 175 [158 S.E. 350] [Ga.]; and *People* v. *Clemente* (1955) 309 N.Y. 890 [131 N.E.2d 294] [N.Y.]; see Annot., *supra,* 37 A.L.R.4th at pp. 960-964.)

[4] The suggestion that there is "unanimity" amongst the federal circuit courts on this issue is not entirely accurate. Our research uncovered two circuits which have held that materiality under 18 United States Code section 1001, making unlawful the willful concealment of material facts in any matter within the jurisdiction of a department or agency of the United States, is a question of fact which should be submitted to the jury. (See *United States* v. *Irwin* (10th Cir. 1981) 654 F.2d 671, 677, fn. 8; *United States* v. *Valdez* (9th Cir. 1979) 594 F.2d 725, 729; but see *United States* v. *Dipp, supra,* 581 F.2d at p. 1328 [in which the Ninth Circuit followed the majority rule].)

Nor can it be concluded that the high court, when reaffirming the rule of *Sinclair* v. *United States* in *Kungys* v. *United States,* was unmindful of its prior holdings in *In re Winship* and *Connecticut* v. *Johnson.* Several years before *Kungys* was decided, challenges *on grounds that the materiality determination is a question of fact which must be submitted to the jury* were rejected in *United States* v. *Greber* (3d Cir. 1985) 760 F.2d 68, and *United States* v. *Falco* (2d Cir. 1982) 697 F.2d 299. The high court *denied* certiorari in those cases. (*Greber* v. *United States* (1985) 474 U.S. 988 [88 L.Ed.2d 348, 106 S.Ct. 396]; *Falco* v. *United States* (1983) 460 U.S. 1068 [75 L.Ed.2d 945, 103 S.Ct. 1521].) In *Greber* v. *United States,* Justice White issued a written dissent from the denial of certiorari, urging his brethren to grant certiorari *on the materiality issue.* (474 U.S. at p. 988 [88 L.Ed.2d at p. 348].)

Likewise, in *People* v. *Powell, supra,* 513 N.E.2d 1162, the Illinois Appellate Court rejected a *Winship*-grounded challenge to the general rule that materiality in a perjury case is a question of law for the court, reasoning: ". . . the determination of materiality involves the relationship between an allegedly false statement and the nature of the proceedings at which it is made. We conclude that this determination is one best suited for a court with its legal expertise and is therefore a question of law." (*Id.,* at p. 1166; *accord State* v. *Sands, supra,* 467 A.2d 202, 215-216.)

Turning to the case at bench, it is difficult to discern from the majority opinion the analytical basis, or compelling rationale, for parting company with the long-settled rule that the determination of the materiality requirement in a perjury prosecution is a question of law for the court.

The majority asserts: "*Figueroa* did not abrogate the question-of-law/question-of-fact distinction in determining whether issues should be submitted to the jury." (Maj. opn., *ante,* at p. 407.) I agree.

But the majority then states: "[*Figueroa*] did suggest, however, that this distinction plays a relatively limited role in view of a defendant's constitutional right to have a jury determine the existence of all elements of the offense charged." (Maj. opn., *ante,* at p. 407.) I submit that, in the unique context of perjury prosecutions, this further proposition finds precious little support.

As the relevant authorities reviewed demonstrate, the question-of-law versus question-of-fact distinction *is indeed at the very heart* of the "historical exception" for perjury prosecutions. Just two years ago the United States Supreme Court reaffirmed that the materiality element of perjury is a "legal question" for the court. (*Kungys* v. *United States, supra,* 485 U.S. at p. 772 [99 L.Ed.2d at p. 854].) The high court has impliedly held that the

due process concerns of *In re Winship* have little or no application to a determination of the materiality requirement in a perjury prosecution. Indeed, the high court in *Kungys* v. *United States* expressly recognized that a determination of materiality in a perjury prosecution does involve "factual evidentiary showing[s]," but the court *nevertheless* concluded that because " 'the ultimate finding of materiality turns on an interpretation of substantive law . . . we believe [it is proper to treat] the issue of materiality as a legal question.' [Citation]." (*Kungys* v. *United States, supra,* 485 U.S. at p. 772 [99 L.Ed.2d at p. 854].) Unlike the majority, I would rely on the decisions of the high court as they interpret and reaffirm that court's prior holdings.

The majority also concludes that "the definition of materiality in prosecutions under the Act necessarily differs from its definition in other perjury cases." (Maj. opn., *ante,* at p. 409.) I find the majority's analysis less than convincing in this regard as well. The crux of this holding appears to be the following passage: "Although we have in past decisions defined materiality in the context of perjury prosecutions based on false statements at trials and at legislative hearings (Pen. Code, § 118), those definitions are inappropriate here because they turn on whether the false statement could have 'influenced the outcome of the proceedings.' (*People* v. *Pierce* [, *supra,*] 66 Cal.2d 53, 61 [perjury in a judicial proceeding]; *People* v. *Matula* [, *supra,*] 52 Cal.2d 591, 595 [perjury at a legislative hearing].) *In a perjury prosecution based on the filing of a false SEI [statement of economic interests] or CDS [campaign disclosure statement], on the other hand, there is no 'proceeding' the outcome of which could be influenced by the false verification.*" (Maj. opn., *ante,* at p. 405, italics added.)

However, as the majority recognizes elsewhere in its opinion, a traditional perjury prosecution under Penal Code section 118 need not necessarily involve perjurious testimony uttered under oath at a judicial or legislative proceeding that stands to influence the outcome of that proceeding. Under the statute's express provisions, the "perjury" can be committed in a false, signed declaration or other writing, as was the case here. There is no further explicit requirement that it "influence the proceedings." (See CALJIC No. 7.21 (1982 rev.) (4th ed. pocket pt.) [given in this case]; maj. opn., *ante,* at p. 404, fn. 1.) To be sure, many if not most of the cases surveyed above— holding that a determination of materiality is a question of law for the court—did arise in the context of perjurious statements made under oath at a judicial or legislative "proceeding." That may be the usual case. But the rationale behind the legion of cases and authorities recognizing that materiality is a question of law does *not* rely on the assumption that an act of perjury will always, of necessity, "influence the outcome" of a judicial or legislative "proceeding." If this has been a *prerequisite* for application of the

long-standing rule that materiality is a question for the court, it has escaped the very formidable body of case law on the subject.

Conversely, even if it need be shown that the perjury was material in the sense that it "influenced the outcome of the proceedings" in order for the general "question of law" rule to apply, the majority wholly fails to explain or substantiate its conclusion that "[i]n a perjury prosecution based on the filing of a false SEI or CDS . . . there is no 'proceeding' the outcome of which could be influenced by the false verification." (Maj. opn., *ante*, at p. 405.)

The Act's reporting requirements are designed to expose improper financial practices such as might give rise to conflicts of interest. Other provisions of the Act expressly prohibit such practices. (See, e.g., Gov. Code, § 87100 ["[n]o public official . . . shall . . . in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest"]; see also *id.*, § 87101 et seq.) Manifestly, the statutory scheme of the Act envisions a myriad of "proceedings"—public elections, governmental functions and political events—the outcomes of which would stand to be unduly influenced or compromised by false and perjured reporting statements filed under the Act.

The majority's analysis is unorthodox in at least one further respect. The majority states: "We are persuaded that [the Act] was intended to permit prosecution for perjury, a felony punishable by imprisonment for up to four years, only in cases involving more serious violations of the Act." (Maj. opn., *ante,* at p. 405.) It is stated immediately thereafter that: "The United States Supreme Court's decision in *TSC Industries, Inc.* v. *Northway, Inc.* (1976) 426 U.S. 438 (*TSC*) is instructive on the issue at hand." (Maj. opn., *ante*, at p. 405.) The majority then discusses the definition of materiality at issue in *TSC* and concludes: "Although *TSC* pertained to shareholder elections and this case involves elections to public office, in both contexts the statutory schemes specify the information that must be disclosed to the voters. *Moreover, the statutory schemes have similar objectives.*" (Maj. opn., *ante*, at p. 406, italics added.)

The majority's reliance on the holding in *TSC Industries, Inc.* v. *Northway, Inc.* (1986) 426 U.S. 438 [48 L.Ed.2d 757, 96 S.Ct. 2126] (*TSC*) is troubling. There is much at stake here; the definition of "materiality" that the majority adopts today will bear directly upon future criminal felony prosecutions for perjury authorized by the Act *but charged* under the express language of Penal Code section 118. I therefore question the majority's determination to place such heavy reliance on the assertedly analogous holding in *TSC.* The defendant in *TSC* was not being criminally prosecuted; that case involved a suit for money damages, restitution and other equitable

relief. The precise legal issue there at hand was judicial construction of the materiality requirement of a rule promulgated by the Securities and Exchange Commission, upon which civil liability was being alleged. (*TSC, supra*, 426 U.S. at pp. 443, 449, fn. 10 [48 L.Ed.2d at pp. 762, 766].) The high court in *TSC* considered only whether summary judgment on the issue of materiality was warranted under the facts of that case. (*Id.*, at p. 450 [48 L.Ed.2d at pp. 766-767].) The underlying general rule—that a criminal defendant is constitutionally entitled to a jury determination of all the elements of the criminal offense with which he is charged—was *not* in issue in *TSC*. I also think it noteworthy that we did not even cite or rely on *TSC* in *Figueroa, supra*, 41 Cal.3d 714—itself a securities case which this court decided 10 years after the high court's holding in *TSC*.

In contrast, the critical question here is whether the "materiality requirement" or "element" of a Penal Code section 118 charge brought pursuant to the Act presents a question of law for the court, or a question of fact for the jury. The answer to that inquiry is what ultimately must determine whether the principles of *In re Winship, supra*, 397 U.S. 358, *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450], and *Connecticut* v. *Johnson, supra*, 460 U.S. 73, are to be applied here. The long-settled line of authority reviewed above inferentially supports the conclusion that the question of "materiality" in a perjury prosecution brought pursuant to the Act, like all other perjury prosecutions, is a question of law for the court, not one of "fact" for the jury. The high court which decided *In re Winship* and *Sandstrom* v. *Montana* has, subsequent to those holdings, reaffirmed the vitality of the "historical exception" for the "materiality requirement" in perjury prosecutions. (*Kungys* v. *United States, supra*, 485 U.S. at p. 772 [99 L.Ed.2d at p. 854].)

I would place far greater emphasis on the holding in *Kungys* v. *United States, supra*, 485 U.S. 759, the earlier decisions of the high court which that opinion reaffirmed, and the numerous prior decisions of this court, our state Court of Appeal, and the majority of sister state jurisdictions—all of which are virtually unanimous in following the historical rule: that "materiality" in a perjury prosecution is a question of law for the court, not one of fact for the jury.

In short, the majority has failed to identify any valid distinguishing factors between "garden variety" perjury prosecutions on the one hand, and perjury prosecutions authorized under the Act (but charged under the statutory language of Penal Code section 118) on the other, such as would justify excluding the latter category of prosecutions from the long-standing rule that materiality is a question of law for the court. As the authorities

reviewed clearly indicate, the exception for materiality determinations in perjury prosecutions is indeed grounded on the question-of-law versus question-of-fact distinction. The majority's analysis fails to "explain away" this historical reality. Given the formidable and unbroken line of authorities, including controlling decisions of the high court, establishing that the materiality determination is a question of law in perjury prosecutions, any attempt to distinguish or abolish this "historical exception" is no easy task. In my view the majority's analysis does not withstand scrutiny, and furnishes inadequate grounds for this court to part company with the formidable body of precedent to the contrary. *Figueroa* involved a prosecution for securities law violations, *not* perjury. I submit that the holding and footnoted dictum in that case should be limited to the legal issue there at hand.

PREJUDICE

Assuming arguendo the correctness of the majority's holding—that the "materiality requirement" in a prosecution for perjury brought under the Act is a determination for submission, along with proper instructions, to the jury—I nonetheless cannot join in the majority's analysis and conclusions respecting prejudice.

The majority opinion states: "Generally, when a trial court instructs the jury that an element of the offense charged is conclusively presumed, the effect of the error appears to be measured by the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* v. *California* (1967) 386 U.S. 18, 21 [17 L.Ed.2d 705, 709, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*Rose* v. *Clark* (1986) 478 U.S. 570, 577 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101]; *Carella* v. *California* (1989) 491 U.S. 263, 265 [105 S.Ct. 218, 221-222, 109 S.Ct. 2419, 2420-2421].) But when the error renders the trial 'fundamentally unfair,' the error is reversible per se. (*Rose* v. *Clark, supra,* 478 U.S. at pp. 577-578 [92 L.Ed.2d at pp. 470-471]; *People* v. *Hernandez* (1988) 46 Cal.3d 194, 210-211 [249 Cal.Rptr. 850, 757 P.2d 1013].) Here, regardless of which test we apply, reversal is required. The factual questions presented to the jury were complex, the defense did not concede the issue of materiality, and the trial court's instruction completely deprived the jury of an opportunity to consider the materiality of defendant's omissions. Under these circumstances, we cannot say beyond a reasonable doubt that the instruction had no effect on the jury's verdict on the perjury offenses." (Maj. opn., *ante,* at p. 410.)

I would apply the "harmless beyond a reasonable doubt" *Chapman* standard, which I believe is clearly the correct standard of review applicable here. As in *Figueroa,* the majority's analysis is rooted in the constitutional principle that a jury must determine whether the prosecution has estab-

lished each element of a charged crime beyond a reasonable doubt. (*In re Winship, supra,* 397 U.S. at p. 364 [25 L.Ed.2d at p. 368].) As such, it is tempting to view the rule we announce today as central to the trial's "truth-finding function." (See *Ivan* v. *City of New York* (1972) 407 U.S. 203, 204 [32 L.Ed.2d 659, 661, 92 S.Ct. 1951].) But the matter bears closer scrutiny in light of recent high court decisions.

"In *Rose,* the high court found that a jury instruction that a homicide is presumed to be malicious violated *Sandstrom, supra,* 442 U.S. 510, in that it effectively eliminated one of the elements of murder, thereby unconstitutionally shifting the burden of proof on such element to the defendant. The Supreme Court went on to conclude that the *Chapman* harmless error standard was applicable to *Sandstrom* error. (*Rose* v. *Clark supra,* 478 U.S. at p. 583.) [¶] *Rose* draws a distinction between fundamental trial errors that are reversible per se, and other federal constitutional errors which are subject to a harmless error analysis under *Chapman,* the former being the exception: 'We have emphasized . . . that while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. [Citation.] Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.' (*Rose, supra,* 478 U.S. at p. 579.)" (*People* v. *Dyer* (1988) 45 Cal.3d 26, 62-63 [246 Cal.Rptr. 209, 753 P.2d 1] [applying *Chapman* test to *Beeman* error (*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318])]; see *People* v. *Lee* (1987) 43 Cal.3d 666 [238 Cal.Rptr. 406, 738 P.2d 752] [conflicting implied-malice instructions in attempted murder prosecution analyzed under *Chapman*].)

In my view the rule the majority announces today has little to do with the *standard* by which determinations of guilt or innocence are made in perjury prosecutions under the Act. Instead, the central issue is *who* should make the requisite determination respecting "materiality": judge or jury? Transferring the responsibility for determining the "materiality" of perjured statements does not, in my view, "raise[ ] serious questions about the accuracy of [the] guilty verdicts. . . ." (*Williams* v. *United States* (1971) 401 U.S. 646, 653 [28 L.Ed.2d 388, 395, 91 S.Ct. 1148].) Stated otherwise, the difference between a judge and a jury as decision maker on the issue of materiality in this perjury prosecution is not likely to have caused a different result. For this reason the *Chapman* harmless-error test clearly applies here.

As I next explain, review of the evidentiary record leads me to conclude that any instructional error was harmless in this case.

Under the Act, public officials running for office are required to file two different sets of disclosure forms. Generally, all public officials must file annual SEI's (statements of economic interests) disclosing financial interests such as income investments, loans, gifts, etc. (See Gov. Code, §§ 87200, 87203.) In addition, candidates, campaign committees and elected officials are required to file periodic CDS's (campaign disclosure statements) detailing a variety of information regarding contributions received and expenditures made by the filer. (See Gov. Code, §§ 4200, 84211.)

The central element in the prosecution's case is found in count 1's allegation of a single overall conspiracy between defendant Roger Hedgecock, Tom Shepard, Nancy Hoover and Jerry Dominelli by which Nancy Hoover and Dominelli would funnel large amounts of money to Hedgecock for personal as well as political purposes, in violation of both local campaign finance laws and state disclosure laws. Of the remaining twelve perjury counts of which Hedgecock was found guilty, seven involve allegedly incomplete CDS's and the remaining five involve alleged omissions from SEI's.

The first two CDS counts (counts 4 and 5) involve statements which include periods of time (before Aug. 1982) during which there was no contract in existence between Tom Shepard and Associates (TS&A) and the Hedgecock for Mayor Committee. (Maj. opn., *ante,* at pp. 400-401.) During this period, the prosecution alleged that TS&A employees performed numerous services for Hedgecock's nascent mayoral campaign for which they were compensated by TS&A. As a result, these services are considered to be in-kind contributions made by TS&A to Hedgecock's campaign committee which were never reported on the relevant CDS's. In addition during this period, TS&A paid for the printing of the Hedgecock endorsement cards and for the Tom Lawrence video consulting sessions which also constituted unreported contributions. As with all the perjury counts, the prosecution's theory was that Hedgecock intentionally failed to disclose these amounts knowing they constituted reportable contributions under the law.

The remaining CDS counts (counts 6, 7, 8, 10 and 12) all involve time periods during which there was some contract in force between TS&A and the Hedgecock for Mayor Committee. (Maj. opn., *ante,* at pp. 400-401.) The prosecution argued that both the original contract in August and the oral modification in December were sham agreements supported by inadequate consideration used as a device to camouflage Hoover and Dominelli's campaign contributions made in the form of capital contributions to TS&A which covered the firm's enormous losses on the Hedgecock account. In

addition, count 6 is based on the direct payment by TS&A of the installation and repair bills on Hedgecock's car telephone.

Hedgecock also filed annual SEI's for 1981 and 1982 while he was still a member of the board of supervisors. The 1981 perjury count (count 3) was based on Hedgecock's failure to disclose Harvey Schuster's $500 payment for legal services rendered to Hedgecock (maj. opn., *ante,* at p. 402) and the $3,000 check received from Jerry Dominelli in December 1981. (*Id.,* at p. 401.) The 1982 perjury count (count 9) was based on Hedgecock's failure to disclose the $16,000 Hedgecock received from Hoover in payment for the David and Linda Inabinett promissory note and Hedgecock's subsequent $10,000 investment in a J. David and Company interbank account. (Maj. opn., *ante,* at p. 402.)

Hedgecock filed three SEI's in 1983. The first covered the period through May 19 and was required because he was leaving office as a county supervisor. (See Gov. Code, § 87204.) The prosecution alleged in count 11 that the statement was false because Hedgecock failed to disclose the interest income he continued to receive from the Inabinetts even after he purportedly sold the note to Hoover. Count 14 involves the SEI which covers the full year 1983 filed by Hedgecock on March 6, 1984. It was alleged to be false because of Hedgecock's failure to disclose the Inabinett interest payments. In addition, although Hedgecock disclosed a loan from Nancy Hoover for the renovation of his residence, the prosecution argued the statement was false because it failed to include Jerry Dominelli and/or J. David and Company as an additional source of the loan. On March 9, 1984, Hedgecock amended his 1983 SEI, making corrections on items not relevant for the purposes of this case. Count 15, which is based on this amended SEI, alleges the statement was false for the identical reasons as count 14.

In sum, under the prosecution's version of the case, Hedgecock was part of a conspiracy to secretly enhance his political career objectives. One of the central goals of the conspiracy was to secretly fund Hedgecock's mayoral campaign. The prosecution theorized that the perjurious disclosure filings under the Act were a planned portion of the conspiracy. According to the prosecution's theory of the case, there was no possibility of mistake or forgetfulness; Hedgecock's actions were deliberate and in furtherance of the conspiracy. Hedgecock presented no defense witnesses to the jury, but argued strenuously that he was guilty of no crime. He asserted that the prosecution had not proven its case beyond a reasonable doubt. He argued that there was no conspiracy, that he had no knowledge of Hoover and Dominelli's funding of TS&A, and that he believed the contract he had with Shepard's firm was for full value, thus requiring no reporting under the Act.

The jury's verdict of guilt on the conspiracy count alone—which conviction the majority itself concludes was unaffected by the "*Winship-Sandstrom*" instructional error—establishes that the jury *rejected* Hedgecock's defense. The jury's verdict of guilt on the conspiracy charge further reflects its determination that Hedgecock acted with specific intent in failing to disclose campaign contributions and sources of incomes over the limits prescribed by the Act.

My review of the totality of facts convinces me that removal of the materiality requirement from the jury's determination in this case was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. at p. 21 [17 L.Ed.2d at p. 709].) Whatever refined definition of "materiality" we apply here, under these facts, my conclusion would remain the same.

## CONCLUSION

I would reverse and direct the Court of Appeal to remand with directions to the trial court to reentertain defendant Hedgecock's motion for a new trial consistent with the dictates of our opinion, and in the event the motion for a new trial is again denied, to enter judgment on all convictions. I join in the majority's affirmance of the Court of Appeal's disposition to issue an alternative writ returnable before the superior court in No. D005661, to be heard concurrently with the motion for a new trial.

**LUCAS, C. J.,** Concurring and Dissenting.—I join in the second part of Justice Eagleson's concurrence and dissent concluding that there is no basis presented for departing from the long held rule that materiality in a perjury prosecution is an issue for the court to determine. In all other respects, I join in the majority opinion.