Filed 7/19/13  P. v. Navarro CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B236494 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA082399) |
| v. | |
| DANIEL NAVARRO et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Richard R. Romero, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Navarro.

Rodger Paul Curnow, under appointment by the Court of Appeal, for Defendant and Appellant Francisco Navarro.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Juan Portillo.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Daniel Navarro, Francisco Navarro, and Juan Portillo of one count of first degree murder (count 1; Pen. Code, § 187, subd. (a)),[1] and two counts of attempted premeditated murder (count 2; §§ 664, 187, subd. (a)), with findings as to all three counts that the offenses were committed for the benefit of a criminal street gang (§ 186.22 (b)(1)(C)).  The trial court sentenced both Francisco Navarro and Juan Portillo to serve an aggregate term of 55 years to life in the state prison, comprised of a term of 25 years to life for the murder and consecutive terms of 15 years to life for the attempted murders.  The court sentenced Daniel Navarro to serve an aggregate term of 58 years to life in the state prison.  He received more time for prior convictions with a prison term.  All three defendants appeal.  We affirm all three judgments.

## FACTS

### *The Crimes*

On July 23, 2003, Javier S., his brother Diego S., their father Alvaro S., their uncle Jose L., and Pedro V., John E. and Benjamin E. were in a courtyard area of an apartment building on 6th Street in Long Beach when a group of between 6 and 13 Hispanic males, most with shaved heads and wearing white T-shirts, entered the area through a gate from a rear alley.[2]  One of the intruding males approached Javier S., and asked him, "Are you the one fucking with my sister?"  Javier S. replied that they had the wrong person.  The man punched Javier S. in the face.

A melee ensued with victims scattering and running for doors and the front of the property.  More than one of the assailants yelled, "This is BST," meaning Barrio Small Town, a criminal street gang.  During the attack, Alvaro S.'s abdomen was knifed open, spilling his intestines.  Jose L. was stabbed multiple times in the back, and Pedro V. was stabbed in the chest.  Witnesses saw and or heard two cars race from the area.  One of the fleeing cars, registered to the mother of Juan Aguas (a co-defendant in the trial court, but not a party to the current appeal), crashed into a parked vehicle, and flipped over.

---

[1]  All further section references are to the Penal Code.

[2]  The eyewitnesses' testimony at trial varied as to the number of intruders.

The occupants in the crashed car climbed from the wreck, and fled. Police and paramedics responded to the scene. Alvaro S. died from his wounds.

***The Trial***

The People filed an information charging Juan Aguas, Daniel Navarro, Francisco Navarro, and Juan Portillo with first degree murder (count 1; § 187, subd. (a)), and two counts of attempted premeditated murder (count 2; §§ 664, 187, subd. (a)). As to all three counts, the information alleged that the offense was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).)[3]

The case was tried simultaneously before two juries. One jury, the "red" jury, decided the charges against Juan Aguas. The second jury, the "green" jury, decided the charges against Daniel Navarro, Francisco Navarro, and Juan Portillo. The appeal before us today arises from trial to the green jury as to Daniel Navarro, Francisco Navarro, and Juan Portillo.[4]

Javier S. and Diego S. (the murder victim's sons), Pedro V. (one of the stabbing victims), Jose L. (the other stabbing victim), Benjamin E., and John E. testified about the overall nature of the attack. Javier S. identified Daniel Navarro as one of men present during the attack, and testified, "I think he was the one with the knife." Javier S. did not actually see anyone stabbing anyone. Further evidence through Javier S.'s testimony and by testimony from City of Long Beach Police Department Detectives Todd Johnson and Hugo Cortez showed that Javier S. identified Daniel Navarro from a photographic line-up

---

[3] The information included a variety of prior conviction allegations as to Daniel Navarro and Francisco Navarro. These allegations are not involved in the current appeal, and are not summarized here.

[4] The trial court employed two juries because there was evidence of statements made by Juan Aguas that could only be used against him. As noted above, Aguas is not a party to the current appeal. Our references to Juan Aguas end here except as needed to clarify the facts.

3

in July 2004 (the photo "looked like one of the guys that was there that night." Javier S. told Detective Cortez that Daniel Navarro "had a knife."[5]

Diego S. did not identify anyone at trial. He testified: "I'm not sure to observe them. [*sic*] We were being attacked." Further evidence through Diego S.'s testimony and testimony from Detectives Johnson and Cortez showed that, in May 2004, Diego S. circled and pointed to a photograph of Juan Aguas in a photographic line-up and stated that he was one of the men present during the attack. In a later conversation in April 2009, Diego S. confirmed his earlier identification from the photographic line-up, and said that the man was "the first guy that came into the courtyard and the one that approached his brother and hit him."

John E. could not identify anyone at trial. Further evidence through John E.'s testimony and testimony from Detectives Johnson and Cortez showed that John E. had identified Juan Aguas from a photographic line-up in May 2004, writing, "That's maybe him." At the same time, John E. orally said something to the effect that "he looked like the first guy that came into the courtyard." The evidence further showed that John E. had identified Daniel Navarro from a photographic line-up in July 2004, writing "was there that night." Benjamin E. also could not identify anyone at trial; he had identified Daniel Navarro from a photographic line-up in July 2004, writing "might have been there that night." At no point either during or before trial did Pedro V. or Jose L. identify any of the assailants.

On the day of the attack, police officers recovered open, unopened and broken beer bottles from the area at and around the scene of the crimes. At trial, Lori Schumann, a senior criminalist in the Los Angeles County Sheriff's Department Crime Laboratory, testified regarding deoxyribonucleic acid (DNA) testing on the beer bottles and swabs taken from Daniel Navarro and Francisco Navarro. Schumann testified there was a random match possibility between DNA on a broken beer bottle recovered from the courtyard area and Daniel Navarro of "one in 495 quintillion" or "approximately 7 billion

---

[5]     The jury heard through other evidence that, in May 2004, Javier S. failed to identify Daniel Navarro from a different photographic line-up.

4

times the current world population." A partial DNA profile with 10 DNA "markers" on the mouth of a whole beer bottle recovered from the alley behind the courtyard had a random match possibility to Francisco Navarro of "one in 171 billion" or "24 times the world's population." The partial DNA profile on the whole bottle was excluded as coming from Daniel Navarro; the partial DNA profile on the whole bottle did not appear to be a mixture of DNA from more than one person.

Erick Moran testified after receiving immunity from the prosecution. Liliana Aguas (co-defendant Juan Aguas's sister) was his girlfriend in July 2003. On July 23, 2003, Liliana told Moran that "some guys" from the "KAs," tagging crew, had "harass[ed] her. They pushed her against a wall." Moran knew about the KAs; he had been in prior disputes with members of the group. He knew the KAs were from Sixth Street in Long Beach, between Cerritos and Alamitos Streets. After hearing Liliana's story, Moran went to a house where co-defendant Juan Portillo ("Wacko") lived, and told Portillo and co-defendant Juan Aguas what had happened to Liliana.[6] Portillo "got upset" when he heard what had happened.

Moran, Aguas, and Portillo got in a car to drive to Sixth Street. It was Moran's idea to go there. More people who had been at Portillo's house followed them in another car, or possibly three cars. The cars parked in an alley near an apartment building. Moran approached a gate to the apartment building. Moran stayed in the passageway next to the inside of the gate. "Everybody" in the alley went into the courtyard. Aguas was the first person to go into the courtyard. More than six people followed Aguas inside. Aguas "[s]ocked some guy," and then chased him when he ran. The intruders who went in the courtyard "were fighting and some people were running out through the front." Moran saw Portillo and Aguas fighting. When asked on cross-examination whether he saw co-defendants Daniel Navarro and Francisco Navarro get out of any of

---

**6** Moran testified that Portillo and Aguas were members of the BST gang. Moran testified that he was a member of a tagging crew called Mind Games or MG, and said its members did not get along with members of the KA tagging crew.

the cars and go into the courtyard, Moran testified, "No." On redirect examination, he testified that he did remember seeing them. Moran did not know several people there.

Moran and the attackers left the scene in separate cars. Moran heard and saw one of the cars crash. The car "flipped," and two to four people got out and ran away. The car belonged to co-defendant Juan Aguas's mother.

Moran drove home. Co-defendants Juan Portillo and Juan Aguas were there. Aguas did not appear to know that his mother's car had been wrecked. Moran drove Aguas and Portillo to Moran's aunt's home, and asked her to drive them to the area where Aguas's mother's car was located. While Moran's aunt was driving them, she asked what was going on. Portillo said something to the effect, "You (or we) will read about it" or "You (or we) will see what happened in the newspaper." Portillo said he "did the stabbing."[7] Aguas told Portillo to be quiet. Aguas also said something to Portillo to the effect, "What the hell did you do that for?"

Patricia Sanchez, Erick Moran's aunt, testified that Moran, Aguas, and a thinner or "skinny guy" wearing glasses came to her home on July 24, 2003, at about 12:30 or 12:45 a.m. She could not identify Aguas or Portillo as the two men. The skinny guy changed his shirt; it was "[s]tained with blood." Sanchez drove Moran and two other men to

---

[7]     Moran testified he was "[s]hocked" upon learning about the stabbing. He had not thought anything like that would happen. When Aguas, Portillo, and the other people went in the courtyard, Moran did not see any of them holding knives. Until Portillo made his admission, Moran did not know that anyone had been stabbed. Moran did not have a weapon. He did not know that anyone was going to bring a knife to the fight, and he had no reason to believe that anyone would do so. Moran testified, "I know [Aguas] didn't have a knife on him." Moran expected only that he and his friends would "confront the guy" who had harassed Liliana. Moran denied that he intended to assault that man. When Moran first spoke to the police, he was not honest about what he knew. This was partly because he was concerned about his safety. Moran knew that Aguas and Portillo were members of the BST gang. Moran did not "want to be called a snitch . . . ."

6

Sanchez's mother's house. As Sanchez was driving, the thinner man said, "Tomorrow, it's going to be in the news."[8]

Jesus Prieto testified he was a member of the BST gang in 2003. Defendants Daniel Navarro, Francisco Navarro, Juan Portillo and Juan Aguas were all members of the BST gang in 2003, and members of the Fourth Street clique. Juan Aguas's moniker was Joker. Daniel Navarro's moniker was Pony. Francisco Navarro's moniker was Mosco. Juan Portillo's moniker was Wacko. Erick Moran also was a member of the BST gang; his moniker was King. Prieto identified a photograph that depicted him, the Navarros, Portillo and Aguas. Portillo was making a Fourth Street gang sign in that photo. Prieto identified another photo of the Navarros, Portillo and Aguas, in which Aguas was making a Fourth Street gang sign.

Prieto testified that Detectives Cortes and McGuire interviewed him in 2009. The interview was recorded and transcribed, and presented at trial. During the interview, Prieto told the detectives that he, the Navarros, Portillo and Aguas, and several other people were at Portillo's house one night, drinking beers. Prieto stayed there while everyone else left. At some point Prieto passed out. The next day or a couple of days later, Portillo (Wacko) made statements to the effect that "they got in a fight" or "got down with some gang," or "taggers." It was the same night they "crashed the car." Portillo said "he fucked some dudes up." When he testified at trial, Prieto said that the police had arrested him, and that they still had him in handcuffs when he spoke to them. Prieto testified that when he told the police what Portillo had said about fighting, Prieto had not been referring to any specific incident, but what their group did in general back during the time when he hung around with them.

---

[8] When Detective Johnson testified, he recalled that Sanchez told him that it had been Aguas who made that statement about the news. During her cross-examination, Sanchez testified she remember telling police that Aguas had made the statement, then later explained that she had been confused by the police officer's questions.

7

Martha Aguas, co-defendant Juan Aguas's sister, testified that in 2003, Aguas "talked to" and was "hanging out once in a while" with the BST gang. His nickname was Joker. On the day of the charged crimes, Liliana said "that somebody grabbed her hair and pushed her . . . by a phone booth and pulled her shirt down." Martha did not hear Liliana say that to Erick Moran. After the crime, Martha went to Sixth Street in a police car, where she recognized her mother's car. It was damaged. Only her mother and co-defendant Juan Aguas drove the car.

Daniel Navarro and Francisco Navarro did not present any defense evidence. Juan Portillo's sister, Melissa Portillo, testified about a photograph of Portillo that she said had been taken in June 2003. Melissa testified that Portillo was the "fattest" he had ever been when the photograph was taken.[9]

On July 20, 2011, the jury returned verdicts finding Daniel Navarro, Francisco Navarro, and Juan Portillo guilty as charged. The trial court later sentenced them as noted at the outset of this opinion.[10]

They filed timely notices of appeal.

## DISCUSSION

*Juan Portillo's Appeal*

I. **Accomplice Testimony**

The trial court instructed the jury pursuant to CALCRIM No. 334, that before it could consider Moran's testimony it had to decide if he was an accomplice. The jury was further informed that if Moran were found to be an accomplice, his testimony must be corroborated and viewed with caution. Portillo contends the trial court erred by failing to instruct the jurors that Moran was an accomplice as a matter of law as set forth in CALCRIM No. 335. Portillo argues that Moran was an accomplice as a matter of law

---

[9] During argument, Portillo's counsel urged that there was no credible evidence that Portillo had been involved in the crimes. Melissa Portillo's testimony was not expressly noted.

[10] Sentencing has not been raised as an issue on appeal.

under the prosecution's "natural and probable consequences" theory of criminal liability. Portillo argues that the difference between the given CALCRIM No. 334 and the ungiven CALCRIM No. 335 requires that his convictions be reversed. We disagree.

A conviction cannot be based on the testimony of an accomplice unless it has been corroborated by other evidence tending to connect the defendant to the commission of the offense. (§ 1111.) An accomplice is one who is subject to prosecution for the identical offense charged against the defendant. (*Ibid.*) Whether a person is an accomplice is a question of fact for the jury unless the evidence and the inferences to be drawn from the evidence are clear and undisputed, in which case the trial court can decide as a matter of law whether a person was or was not an accomplice. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103; *People v. Carrington* (2009) 47 Cal.4th 145, 191; *People v. Williams* (1997) 16 Cal.4th 635, 679.)

Evidence showing that a person was present at the scene of a crime, or drove a defendant to the scene of a crime, or observed the crime being committed, does not, standing alone, constitute sufficient evidence to establish that the person was an accomplice. (*People v. Sully* (1991) 53 Cal.3d 1195, 1228.) Nor does evidence showing that a person had knowledge of an impending crime necessarily make the person an accomplice. (*People v. Lewis* (2001) 26 Cal.4th 334, 369.) An accomplice for purposes of giving an accomplice testimony instruction means the person was a co-principal or an aider and abettor—one who "actually knows and *shares* the full extent of the perpetrator's specific criminal intent and actively promotes, encourages or assists the perpetrator with the intent and purpose of advancing the perpetrator's successful commission of the target offense." (*People v. Snyder* (2003) 112 Cal.App.4th 1200, 1220 (*Snyder*).) In the context of the natural and probable consequences theory of criminal liability, an aider and abettor, and thus an accomplice for purposes of an accomplice testimony instruction, "'is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets.'" (*People v. Coffman and Marlow, supra*, 34 Cal.4th at pp. 106-107.)

9

It was Portillo's burden to establish by a preponderance of the evidence that Moran was an accomplice. (*Snyder*, at p. 1219.)

In the current case, a reasonable juror *could have* concluded that Moran had the intent to assault the man who harassed his girlfriend or the intent to assist Aguas in assaulting the man. And a reasonable juror *could have* concluded that Moran was liable for the murder and attempted murders that ensued from an intended assault because those crimes were a natural and probable consequence of the assault. However, the problem with Portillo's argument is that a reasonable juror was not *required* to make all or any of these findings because the evidence was not clear and undisputed. For this reason, the trial court was not required to instruct the jury Moran was an accomplice as a matter of law.

First, there is conflicting evidence about whether Moran was either a perpetrator or an aider and abettor. Moran testified that he did not see anyone with a knife before his group entered the courtyard where the crimes occurred. He testified that he was "shocked" when he heard there had been a stabbing. He testified he did not bring a knife with him, and did not see Juan Aguas bring a knife. Moran testified he had not talked to Aguas about "killing these guys" before the incident. He testified he did not know, prior to the attack that someone was going to bring a knife. He testified he had thought that Aguas and the others were just going to "confront" the guy who harassed Aguas's sister, which did not mean an assault or a killing. We acknowledge the evidence discussed in Portillo's opening brief on appeal tending to show that Moran was an accomplice. But it was the jury's task to weigh the conflicting evidence, and to decide whether Moran had harbored the intent needed to make him an aiding and abetting accomplice.

Second, a reasonable juror could have determined, based "on the specific circum-stances" of the current case, that the charged murder and attempted murders were not, in fact, a natural and probable consequence of a planned assault. (*People v. Medina* (2009) 46 Cal.4th 913, 920.) As our Supreme Court has explained in finding that *substantial evidence supported a jury's guilty verdict in a natural and probable consequences case* involving a murder ensuing from an assault: "In examining the whole record in the light

10

most favorable to the prosecution, we conclude that a rational trier of fact *could have found* that the shooting of the victim was a reasonably foreseeable consequence of the gang assault in this case." (*Id*. at p. 922, italics added.) But the cases cited in the opening briefs on appeal here do not support the proposition that a reasonable juror *must always* make a factual finding that a murder is a natural consequence of a gang assault. Portillo argues that *Medina* and other cases such as *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11, *People v. Montes* (1999) 74 Cal.App.4th 1050, 1053, 1056, and *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376, support the proposition that the trial court here was required to instruct the jury that Moran was an accomplice as a matter of law. We read the cases differently. Those cases support the proposition that a jury's finding there was a factual nexus between a gang assault and a murder will be sustained on appeal against an insufficiency of the evidence claim. They do not support the proposition that a person who has some connection to a gang assault that led to a murder is, for purposes of jury instructions, always an accomplice.

Because it was the jury's task to decide what Moran intended or did, if anything, regarding the initial assault, and whether the murder and attempted murders were then a natural and probable consequences of the assault, the trial court correctly chose not to instruct the jury that Moran was an accomplice as a matter of law. The jury was free to decide that Moran was an accomplice under the instruction given, CALCRIM No. 334, and we have not been persuaded by the arguments on appeal that the more focused instruction in CALCRIM No. 335 was required.

Lastly, even assuming the trial court erred in instructing with CALCRIM No. 334 instead of CALCRIM No. 335, we will not reverse Portillo's convictions because we find the error harmless no matter what standard of review is employed. (Compare *People v. Watson* (1956) 46 Cal.2d 818, 836 and *Chapman v. California* (1967) 386 U.S. 18, 24.) Portillo's opening brief on appeal does not offer an explanation of how instructing with CALCRIM No. 334 rather than CALCRIM No. 335 adversely affected him at trial. He seems to assume that, given CALCRIM No. 335, the jury would have (1) rejected Moran's testimony in its entirety, and (2) without Moran's testimony, would not have

11

convicted Portillo. We do not come to the same conclusion. The evidence against Portillo consisted of more than Moran's testimony. There was evidence from other sources that Portillo admitted "they got down" with some other gang members or taggers, and that he (Portillo) "fucked some dudes up."

Further, under the accomplice instruction given, the jurors were told that if they found Moran was an accomplice, his testimony needed to be supported by other evidence, and his testimony should be viewed with caution. The instruction is based in part on the rule of law that a conviction cannot be based on an accomplice's testimony unless it has been corroborated by other evidence tending to connect the defendant to the commission of the offense. (§ 1111.) It is well-settled that a trial court has a duty to instruct sua sponte on the law regarding accomplice testimony, including the need for corroboration, when the evidence at trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice. (See, e.g., *People v. Zapien* (1993) 4 Cal.4th 929, 982.) It is also well-settled that a trial court's failure to instruct on the law regarding accomplice testimony is harmless error where the trial record otherwise discloses sufficient evidence corroborating the defendant's guilt. (*Ibid.*) The quantum of corroborating evidence need only be slight, and need not itself establish be sufficient to establish every element of the charged offense. (*Ibid.*) We have read nothing in the briefs on appeal to persuade that an error in giving CALCRIM No. 334 over CALCRIM No. 335 may not be reviewed under a similar corroborated-evidence standard of harmless error. If a trial court's error in failing to give any accomplice testimony may be reviewed for harmless error, then it would seem to us that an error in giving one accomplice instruction as opposed to another also may be reviewed for harmless error.

In the current case, we see sufficient corroborating evidence to lead us to conclude that any error in giving CALCRIM No. 334 instead of CALCRIM No. 335 was harmless.[11] Moran's testimony placed Portillo at the scene of the charged offenses, and showed that Portillo admitted he stabbed a person or persons. Moran testified that he drove with others, in two cars, to the scene of the crimes. These facts were corroborated by other witnesses. Patricia Sanchez testified Moran, Aguas and a "skinny guy" with glasses showed up at her home early on the morning of July 24, 2003, and that the skinny guy's shirt was stained with blood. Moran testified that he, Juan Aguas and the others went to the scene of the crime to confront someone who harassed Aguas's sister. The victims testified that just before the crimes an assailant asked Javier S. whether he was the one who had been harassing the assailant's sister.

Moran testified about the cars fleeing the scene, and that one of the cars crashed. These facts were corroborated by other witnesses and the objective proof that an Aguas' mother's car was involved in accident. Moran's testimony that Portillo was present at the scene, and admitted to doing the stabbing, was corroborated by Jesus Prieto who told detectives in 2009 that Portillo admitted he "fucked some dudes up." We are satisfied that Moran's "accomplice" testimony was sufficiently corroborated to alleviate any error in giving CALCRIM No. 334. Portillo's trial counsel argued that the case against Portillo was built on a tripod of liars, namely Moran, Prieto and Sanchez. In convicting Portillo, and applying the usual rules of appeal, we find the jury must have believed their testimony, at least to the extent it showed Portillo participated in the attack. Portillo's credibility assertions about the evidence do not mean that Moran's testimony was not corroborated.

---

[11] For these same reasons, Portillo's additional challenge to his conviction on the basis that Moran's testimony was not corroborated is likewise meritless.

13

## II.     Burden of Proof

Portillo also contends his convictions must be reversed because CALCRIM No. 334 suggested that that the jurors needed to find Moran a direct aider and abettor to the murder and attempted murders in order to find Moran was an accomplice.  Portillo argues the trial court should have added language to CALCRIM No. 334 sua sponte to clarify that a person may be found to be an accomplice if he intends to aid and abet, and did aid and abet, an assault where an ensuing murder was the natural and probable consequent of the assault.  Portillo argues "a properly instructed jury would have found Moran an accomplice[,]" distrusted his testimony, and had reasonable doubt about Portillo's guilt.  Again, we disagree.

First, Portillo forfeited his claim of error on appeal regarding CALCRIM No. 334 because he did not request amplification of the standard instruction.  When the trial court gives a standard accomplice instruction, without objection, a defendant cannot complain on appeal that the instruction was too general or incomplete.  (*People v. Gonzalez* (2002) 99 Cal.App.4th 475, 483.)  Portillo's reliance on *People v. Williams* (1988) 45 Cal.3d 1268 and similar cases (see, e.g., *People v. Easley* (1983) 34 Cal.3d 858, 875; *People v. Trevino* (1988) 200 Cal.App.3d 874, 877; *People v. Williams* (1971) 22 Cal.App.3d 34, 57) for a different rule is not persuasive.  The cases cited by Portillo support the principle that a failure to object to an instruction at trial will not result in a forfeiture of a claim of instructional error on appeal where an instruction wrongly stated the law, and the defendant's substantial rights were affected.  That is not what happened here.  CALCRIM No. 334 correctly stated the law governing accomplice testimony; Portillo just wanted the instruction modified.

Even if Portillo's instructional claim were not forfeited, we would still find no error in the giving of CALCRIM No. 334.  On appeal, we examine a challenged jury instruction in the context of the instructions as a whole, and in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in the way the defendant asserts.  (See *People v. Kelly* (1992) 1 Cal.4th 495, 525-526.)

14

We also presume on appeal that jurors are able to understand and correlate all of the instructions given.  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148.)

The trial court instructed on accomplice testimony, and on the natural and probable consequences theory of criminal liability.  It is true that the literal text of the accomplice testimony instruction did not incorporate by direct reference the natural and probable consequences theory of criminal liability.  However, we see nothing in the record to support Portillo's position that the jury would not have understood that Moran could be an accomplice unless it found he directly aided and abetted the murder and attempted murders.  The basis of the prosecution's case was the natural and probable consequences doctrine as to all three defendants.  The jury knew that Moran testified under a grant of immunity.  The defense lawyers, including Portillo's own counsel, challenged Moran's credibility on the basis that he had been involved.  As Portillo's counsel argued to the jury:  "[Moran] started all of this.  It's because of him that the victim is dead. . . .  He went over there to kick some ass, and it got out of hand."  We are amply satisfied the jury understood that the natural and probable consequences applied to all three defendants, and that it could be applied to Moran as well in determining whether he was an accomplice.

Assuming there was error in giving CALCRIM No. 334 in the form it was given, we find no prejudice under any standard of review.  (Compare *People v. Watson, supra,* 46 Cal.2d at p. 836 and *Chapman v. California, supra,* 386 U.S. at p. 24.)  On a state law level, the lack of an instruction on the natural and probable consequences theory as it may relate to an accomplice is not prejudicial to the defendant if the accomplice's testimony is sufficiently corroborated by independent evidence of the defendant's guilt.  (See *People v. Avila* (2006) 38 Cal.4th 491, 568.)  As discussed above, we find Moran's testimony was sufficiently corroborated.

From a federal constitutional perspective, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is '"whether the ailing instruction"' so infected the entire trial that the resulting conviction violates due process."'  [Citation.]  '"A single instruction to a jury may not be

15

judged in artificial isolation, but must be viewed in the context of the overall charge."' [Citation.] If the charge as a whole is ambiguous, the question is whether there is a "'reasonable likelihood that the jury has applied the challenged instruction in a way" that violate[d the defendant's constitutional rights].' [Citation.]" (*Middleton v. McNeil* (2004) 541 U.S. 433, 437; see also *People v. Huggins* (2006) 38 Cal.4th 175, 192.)

We see no such likelihood here. The accomplice testimony instructions given concerned only the credibility of a potential accomplice, it did not address the prosecution's burden to prove guilt beyond a reasonable doubt. The credibility of witnesses was addressed by other instructions. Portillo's argument that the jurors must have found he was not an accomplice finds no support in the record; the jurors may well have found him an accomplice and still believed his testimony. That was within their prerogative as the trier of fact.

Portillo's argument that if the jurors found him to be an accomplice then they would not have believed his testimony also finds no support in the record. The jurors knew that Moran had involvement in the events on the day of the crimes, and knew Moran's credibility was at issue. In convicting Portillo, and in applying the usual rules of review on appeal, it must be accepted that the jurors resolved any credibility issue by believing Moran. We are not persuaded that this resulted from giving CALCRIM No. 334 in the form in which it was given.

Finally, Portillo's argument that he received ineffective assistance of counsel by the failure of his trial counsel to request the amplifying language he proffers on appeal is defeated by our conclusions that there was no error and no prejudice from any error. Specifically, in the event there was no instructional error, Portillo's trial counsel did not act below that of a reasonably competent attorney in failing to seek clarification of the instruction. In the event an error occurred, it did not contribute to Portillo's conviction and there was no prejudice from counsel's inaction within the meaning of the ineffective assistance of counsel cases. (See, e.g., *People v. Farnam* (2002) 28 Cal.4th 107, 148; and see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.)

16

## III.   Joinder

Portillo's joinder in arguments advanced by his co-defendants and co-appellants will be addressed below as presented.

*Francisco Navarro's Appeal*

## I.   Sufficiency of the Evidence — The Substantive Offenses

Francisco Navarro contends all of his convictions must be reversed because they are not supported by substantial evidence.[12]  We find otherwise.

Our role in determining the sufficiency of the evidence is limited.  We review "'the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Tafoya* (2007) 42 Cal.4th 147, 170.)  We do not reweigh the evidence or redetermine the credibility of the witnesses (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), and "[w]e draw all reasonable inferences in support of the judgment." (*People v. Wader* (1993) 5 Cal.4th 610, 640.)  "If the circumstances reasonably justify the [finder of fact's] findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.]  The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Francisco argues "there was <u>no</u> evidence . . . that [he] participated in these crimes in any way."  He acknowledges there is evidence showing he was an active member of the BST gang at the time of the crimes, that he was at co-defendant Portillo's home before the crimes, and that he is the brother of co-defendant Daniel Navarro.  But, argues Francisco, the absence of evidence showing that *he* did anything during the attack in the courtyard demonstrates that he was found guilty merely by association.  Francisco admits

---

**12**    Because he has the same surname as co-defendant and co-appellant Daniel Navarro, we refer to Francisco Navarro hereafter by his first name for sake of clarity. No disrespect or affinity is intended nor should it be inferred.

that a beer bottle was recovered near the courtyard crime scene, and that a partial DNA reference sample from it was matched to him. However, he claims the DNA match does not show he brought the bottle there, threw it, or otherwise used it in the incident since it was unbroken and found "across the alley from the entryway to the courtyard." We find the evidence sufficient to sustain Francisco's convictions.

Francisco was a member of the BST gang, and that he was with his fellow members of that gang immediately before they went to the scene of the murder to avenge a gang member's sister who had been harassed earlier in the day. Francisco's DNA on a beer bottle found there supports the jury's conclusion that he went to the area of the attack and was in the alley. Moran testified that two or more cars stopped in the alley and the occupants in the cars got out. Moran said he went to a gate, and "then [he] seen [*sic*] *everybody* just running inside and fighting and *everybody* just run back outside." (Italics added.) After being asked a questions about the cars, the people getting out of the cars, and the gate, the prosecutor asked: Isn't it true that *everybody* went into the courtyard who had pulled into the alley?" (Italics added.) Moran answered: "Yeah." Based on this evidence, the jury could reasonably conclude Francisco was at least an aider and abettor to the attack.

Francisco counters that Moran did not expressly identify him as one of the attackers. Further, that on cross-examination, Moran testified he did not see Francisco at the scene. We agree that is the state of the evidence. Nevertheless, the standard of review dictates we examine the evidence in a light most favorable to the prosecution. In doing so, we find the circumstantial evidence of Francisco's participation sufficient to support his conviction. Francisco also proffers that it is possible someone else may have carried the beer bottle to the area. Even assuming the possibility existed, the jury reasonably could have found otherwise. Moran's testimony, Francisco's involvement with the gang members immediately preceding the crime, the presence of the beer bottle with his DNA at the scene and that all persons present went inside the gate and all

participated in the attack is sufficient to support the jury's finding that Francisco entered the courtyard and joined the fray, and did so as part of an orchestrated incident.[13]

## II. Juror Information

Francisco next contends the trial court abused its discretion in denying his post-trial petition to disclose juror information, and or in failing to conduct an evidentiary hearing on the issue of disclosing juror information. We find no abuse of discretion.

A criminal defendant has a federal and state constitutional right to be tried by an impartial jury. (U.S. Const. Amends. VI, XIV; Cal Const., art. I sec. 1.) In this state, a defendant's right to a trial by an impartial jury is protected in some measure by Code of Civil Procedure section 237. Under Code of Civil Procedure, subdivision (a)(2), upon the jury's verdict in a criminal case, the trial court's record of personal juror identifying information of trial jurors "shall be sealed until further order of the court as provided by this section." But thereafter, under Code of Civil Procedure section 237, subdivision (b), a defendant may file a petition for access to the juror records. The petition must be supported by a declaration setting forth facts sufficient to establish "good cause for the release of the juror's personal identifying information." Code of Civil Procedure section 206, subdivision (g), provides that juror information may be obtained pursuant to Code of Civil Procedure section 237 as "necessary for the [defense] to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose."

A defendant may demonstrate good cause to obtain juror information by making a showing that is sufficient "'to support a reasonable belief that jury misconduct occurred.'" (*People v. Jones* (1998) 17 Cal.4th 279, 317.) The alleged misconduct must be "'of such a character as is likely to have influenced the verdict improperly.'" (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.)

---

[13] Juan Portillo and Daniel Navarro join all arguments, as applicable, by each other and Francisco Navarro. (See Cal. Rules of Court, rule 8.200.) To the extent Juan Portillo and Daniel Navarro challenge the sufficiency of the evidence in support of the jury's guilty verdicts on the substantive offenses as to each of them, we reject their claim. The evidence against Juan Portillo and Daniel Navarro is stronger than against Francisco Navarro.

19

The trial court may conduct an evidentiary hearing to determine the truth of an allegation of juror misconduct. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415-416; *People v. Hayes* (1999) 21 Cal.4th 1211, 1255.) Such a hearing is appropriate when a defendant has presented the court with evidence demonstrating a strong possibility that prejudicial misconduct took place. Though the defendant is not entitled to a hearing as a matter of right, one should be held when needed to resolve material, disputed issues of fact associated with a claim of juror misconduct. (*People v. Hedgecock, supra,* 51 Cal.3d at pp. 415-416; *People v. Hayes, supra,* 21 Cal.4th at p. 1255.)

Denial of an evidentiary hearing on a petition is reviewed for abuse of discretion (*People v. Hedgecock, supra,* 51 Cal.3d at pp. 415-416; *People v. Hayes, supra,* 21 Cal.4th at p. 1255) as is the denial of a petition for disclosure of juror personal information. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991; *People v. Santos* (2007) 147 Cal.App.4th 965, 978.)

Francisco contends the trial court abused its discretion because he made a showing of good cause "to believe that jury misconduct occurred." He argues that the possibility of jury misconduct was shown by his trial counsel's declaration in support of the petition for disclosure of juror information, and by his counsel's statements in open court. This showing established in effect: (1) jurors had talked to counsel after trial, and commented they thought he did a good job, but they felt compelled to convict because there had been "a lot of evidence in the case as a whole;" and (2) when asked by counsel what they saw as the evidence specifically against Francisco, the jurors could not specifically point to such evidence. Francisco essentially argues his counsel showed possible jury misconduct by showing the jurors may have convicted him without evidence of his specific guilt and thus may have violated their oaths and the trial court's instructions to evaluate the evidence of guilt as to each of the defendants separately.

We see no abuse of discretion in denying the petition for disclosure of the jurors' personal information because we see showing of possible juror misconduct. The jurors were not required to give Francisco's trial counsel an articulate and detailed explanation for their verdicts against Francisco. The jurors' vague and polite post-trial statements to

Francisco's trial counsel here are not evidence of juror misconduct. Generally speaking, juror misconduct refers to any conduct by a juror that calls into question the fairness of the jury's verdict. The following circumstances are illustrative of juror misconduct: (1) receiving evidence from outside the trial; (2) talking about the case with persons outside of the trial; (3) separate discussion among jurors about the case outside of deliberations; (4) rendering a chance verdict; (5) inattentiveness at trial; and (6) concealing bias during voir dire. (See 6 Witkin and Epstein, California Criminal Law (4th ed. 2012) Criminal Judgment, § 117, pp. 160-162.) Here, the jurors' comments to Francisco's trial counsel do not show conduct of such a nature as to call into question their fairness. If the jurors "got the case wrong," that is a proper subject for Francisco's argument challenging the sufficiency of the evidence. But he did not make a showing of conduct that supports a reasonable belief that juror misconduct.

## III. Sufficiency of the Evidence — The Gang Allegations

Francisco contends the gang allegations must be reversed because none is supported by substantial evidence. He argues he is in a similar situation with co-appellant Daniel Navarro with respect to this issue, and joins Daniel Navarro's briefing. (See Cal. Rules of Court, rule 8.200(a)(5).) We address and reject Daniel Navarro's argument that the evidence does not support the gang benefit findings below. For the same reasons explained below in addressing Daniel Navarro's appeal, we find substantial evidence supports the gang benefit findings attached to Francisco's convictions.

## IV. Accomplice Testimony

For the reasons explained above in addressing co-defendant Juan Portillo's appeal, we reject Francisco's contentions that the trial court erred in any manner when it instructed the jury with CALCRIM No. 334 and not CALCRIM No. 335, as to the testimony of prosecution witness Erick Moran. We found any error harmless in Portillo's appeal and the reasons underlying those findings apply equally to Francisco.

21

## I.     Sufficiency of the Evidence — The Gang Enhancements

Daniel Navarro contends the gang allegations must be reversed because none is supported by substantial evidence.[14]  More specifically, Daniel contends (1) the trial evidence showing that the BST gang's "primary activities" included committing crimes enumerated in the gang benefit statute was deficient; and (2) the evidence showed only a personal, not a gang-related, intent for the charged offenses.  We are not persuaded.

In order to prove the "primary activities" element of the gang benefit statute, the evidence must show that committing the crimes enumerated in the statute is "one of the group's 'chief' or 'principal' occupations."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)  As our Supreme Court has explained:  "'Though members of the Los Angeles Police Department may commit an enumerated offense while on duty, the commission of crime is not a *primary activity* of the department.'"  (*Id.* at pp. 323-324.)  A gang's primary activities may be proved by expert testimony.  (See *People v. Gardeley* (1996) 14 Cal.4th 605, 617-620.)  A gang expert's testimony may be based on his or her personal conversations with gang members, and personal investigation of gang-related crimes, and any other information of a nature that an expert may use to render his or her opinions.  (*Id.* at p. 620.)

At trial, Long Beach Police Department Detective Hector Cardiel from the department's gang enforcement section testified as an expert on the BST gang.  The detective's testimony included a description of his education, training, and experience dealing with gangs.  As a member of the gang enforcement section for more than 10 years, Detective Cardiel assisted on all gang-related shootings and homicide investigations in the city, gathered intelligence on gang members, contacted gang members, tracked the activity of gangs, and talked to victims and witnesses of gang crimes, as well as family members of gang members and non-gang members.  For the

---

[14]     Because he has the same surname as a co-defendant and co-appellant Francisco Navarro, we refer to Daniel Navarro hereafter by his first name for sake of clarity. No disrespect or affinity is intended nor should it be inferred.

longer period of 15 years as a police officer, Detective Cardiel has been in contact with gang members, victims, and witnesses as part of his regular duties. He has had contact with gang members "on a daily basis." These contacts include interviewing gang members, and completing field identification cards. Detective Cardiel has had contacts with BST gang members "numerous times," and had investigated crimes committed by members of the BST gang members. In addition to his police training and experience, Detective Cardiel has personal experience with gang members. He grew up in South Central L.A., where he knew gang members, and witnessed robberies, shootings, and gang initiations. He was a victim of a shooting.

When asked on direct examination, "What are the primary activities of [the BST] gang?" Detective Cardiel answered, "Robbery, shootings, stabbings, homicides, drug sales, assault with a deadly weapons, burglaries, car jackings . . . ."

Detective Cardiel's testimony constituted sufficient evidence of the BST gang's primary activities. The evidence in the current case was not at all akin to the type of cursory and conclusory testimony found deficient in cases such as *In re Alexander L.* (2007) 149 Cal.App.4th 605.

Making a more focused challenge against Detective Cardiel's testimony, Daniel argues the detective's testimony was not sufficient to prove the gang allegation because, when asked on cross-examination whether he had attempted to "look up anything" or do "research" to determine the "actual crimes that were committed by documented members of [the BST gang]," the detective answered that he had attempted such research, but that his efforts had not been successful. He explained: "I couldn't find a system or anything within our police department that would give that type of information other than field interview cards on the gang." Basically, Daniel argues Detective Cardiel's testimony was not sufficiently supported by reliable underlying information of a type ordinarily relied upon by experts; it had had no support in reliable, documented records.

Detective Cardiel's expert testimony in this case was based less on collected reference materials than on his personal knowledge and experience dealing with gangs over a 15-year police career, including a little over 10 years personally investigating gang

crimes and gathering gang information, including "numerous" investigations of crimes committed by BST gang members. Still, we are more than satisfied that the detective could offer an opinion on the BST gang's primary activities based upon his personal knowledge and experience. Detective Cardiel did not necessarily have to rely on collected facts from other sources as may be the case in certain other gang expert testimony situations. His personal experience interacting with gangs on the streets of Long Beach for 15 years is itself a valuable resource for the information. Expert testimony is often based on education, training, and experience. A reference to some type of library of the crimes committed by BST beyond that which was set forth in the field interview cards was not required. We agree that a gang allegation is not so simply because a prosecution's gang expert says it is so, but the cases cited in Daniel's opening brief on appeal do not support the proposition that it is absolutely required to have a gang expert's testimony supported by reference to documented records.

Turning to Daniel's alternative contention, we reject his argument that there was no evidence demonstrating the crime was committed for the benefit of a gang and instead only a personal motivation for the charged crimes. Daniel argues: "Unlike the usual gang case, there was no evidence of a *gang rivalry* or war between BST and the taggers. [Daniel] and his companions went to the apartment to confront the men who had harassed Liliana." We disagree with Daniel's argument for a few reasons. First, no case cited in Daniel's opening brief supports his implicit argument that a personal motive and a gang benefit motive are mutually exclusive. The important element here is that the prosecution's gang expert, Detective Cardiel, testified that crimes of the nature that were perpetrated in the courtyard would have been for the benefit of the BST gang. If it was purely a personal matter, then members of the attacking group would not have been shouting "BST" during the onslaught.

Second, no case supports the proposition that a gang benefit motive cannot arise outside of a gang rivalry or war setting. Again, the prosecution's gang expert, Detective Cardiel, testified there was a gang benefit in the form of intimidating the local residents and community.

24

Last, we reject Daniel's reliance on *In re Daniel C*. (2011) 195 Cal.App.4th 1350 for reversal. In *Daniel C*., a juvenile court found that a minor had committed the offense of robbery and that the allegation the crime was committed for the benefit of a criminal street gang was true. The evidence showed that the minor took a bottle of Jack Daniels off a supermarket shelf and started to leave the premises. When confronted by an employee, the minor swung the bottle at the employee. The Court of Appeal reversed the gang finding, ruling that there was no evidence the minor had committed the offense "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id*. at p. 1359, italics omitted.) The court found that evidence showing the minor associated with gang members, and was with other gang members at the time of the offense, was not enough to show intent to promote the gang's criminal activities. (*Id*. at pp. 1359-1364.)

In the current case, the facts are materially different. Here, multiple members of a gang committed crimes together, while members of the gang shouted the gang's name. The prosecution's gang expert testified that crimes of such a nature would be conducted to promote the gang's criminal activities by intimidating the local residents. We are satisfied that the evidence supported the jury's finding that Daniel participated in the charged crimes with the intent to promote the criminal activities of the BST gang.

## II.     The Accomplice Instruction Issue

For the reasons explained above in addressing co-appellant Francisco Navarro's appeal, we reject Daniel's argument that all of his convictions must be reversed because the trial court instructed with CALCRIM No. 334 instead of CALCRIM No. 335.

## III.     Joinder

Daniel joins all of the arguments of his co-appellants. We have addressed such issues as presented, and, for the reasons, explained, find no reversible error as to Daniel.

## DISPOSITION

The judgments are affirmed.

BIGELOW, P. J.

We concur:

FLIER, J.

GRIMES, J.